UNITED STATES of America,
Plaintiff-Appellee,

v.

Bernard MURRAY,
Defendant-Appellant.

Nos. 83–1050, 84–1140.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 29, 1985.

Decided Feb. 13, 1986.

Thomas A. Howard and Laurel Stuart, argued, Detroit, Mich., for defendant-appellant.

Joel M. Sherer, U.S. Atty., Janice Terbush and Gary Maveal, argued, Detroit, Mich., for plaintiff-appellee.

Before KEITH and KRUPANSKY, Circuit Judges, and EDWARDS, Senior Circuit Judge.

GEORGE CLIFTON EDWARDS, Jr., Senior Circuit Judge.

Appellant Murray was indicted on five counts of mail fraud as a result of what a jury found to be fraudulent insurance claims. A jury found defendant guilty on all five counts and the District Judge sentenced Murray to a four-year probationary term and fined him $5,000. The facts available to the jury in this case on which it found defendant guilty were such as to constitute support for the conviction.

Nonetheless, issues of substance are present in this appeal. The first concerns whether or not a prosecution witness's mention of the words "polygraph examination" before he was stopped by objection (promptly sustained by the court) constituted reversible error. The second concerns whether there was reversible error in the court's charge.

As to the first of these asserted errors, mention of a polygraph test introduced serious error into this record. This Circuit holds any introduction of polygraph material to be error. *United States v. Fife*, 573 F.2d 369 (6th Cir.1976), *cert. denied*, 430 U.S. 933, 97 S.Ct. 1555, 51 L.Ed.2d 777 (1977). Our examination of this record does not allow us to agree with the government that the error was harmless beyond reasonable doubt. So far as can be determined from this record, the comment was introduced deliberately by an experienced FBI Agent. It was, of course, objected to immediately, and, out of the presence of the jury, the District Judge heard and sustained the objection and

agreed to and did charge the jury to disregard it. Such an instruction, however, is very close to an instruction to unring a bell. We do *not* hold that under any and all circumstances in every case where the words "polygraph examination", are mentioned, a grant of a new trial would be required. The proofs of guilt in this case are not, however, so overwhelming as to allow us to say the error complained of here was harmless beyond reasonable doubt.

█ If we did have doubt concerning whether the first issue we have discussed mandated vacating the judgment and sentence and granting a new trial, we do not think that we would be able to escape the conclusion that the errors in the charge (when added to the first error) were together sufficiently serious to represent reversible error. The most serious of defendant's contentions about the charge are the following:

> The defendant is at present presumed innocent. The Government has the burden of proving him guilty beyond a reasonable doubt and if it fails to do so, you must acquit him. *It is not required that the Government prove guilt beyond a reasonable doubt, all possible doubt.* The test is one of reasonable doubt.

> \*   \*   \*   \*   \*   \*

> .... It is sufficient if the evidence in the case establishes beyond a reasonable doubt that the offense was committed on a date reasonably near the date alleged. There are, generally speaking, two types of evidence from which a jury may properly find the truth as to the facts of a case. One is direct evidence such as this testimony of an eye witness. The other is indirect or circumstantial evidence, the proof of a chain of circumstances pointing to the existence or nonexistence of certain facts. *As a general rule, the law makes no distinction between direct and circumstantial evidence, but simply requires that the jury find the facts in accordance with the preponderance of the evidence in the case, both direct and circumstantial.* (emphasis added)

T., September 14, 1982, pp. 133–34; pp. 139–40.

We recognize, of course, that the standard and proper charge, "The burden is all upon the prosecution to prove guilt beyond a reasonable doubt," was given and reiterated a number of times. Nonetheless, there is no way to be certain that the jurors did not have fixed in their minds the clearly erroneous instructions which we have quoted and underlined above.

The government has evidence pointing toward Mr. Murray's guilt which may well convince another jury, not subject to the errors we have cited, that they should render the same verdict of guilty as did the jury in our instant case. We do not, however, find from this record available to us as a reviewing court the conviction that the errors recited above were harmless in the sense that they "did not influence the jury" or had "but very slight effect."

We believe that this standard for our review was established long ago in *Kotteakos v. United States*, 328 U.S. 750, 764–65, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946), where the Supreme Court said:

> If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and judgment should stand, except perhaps where departure is from a constitutional norm or a specific command from Congress.... But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phrase affected by the error. It is rather, even so, whether the error itself had substantial influence.

The judgment of the District Court is reversed and the case is remanded for new trial.

KRUPANSKY, Circuit Judge, concurring in the result.

While I concur in the result the majority reaches in this case in remanding the matter for a new trial, I am constrained to disagree with the majority on the significance of the polygraph remark by the FBI agent at trial. Rather, I would reverse solely on the basis of the trial judge's erroneous instructions to the jury.

On appeal, appellant Bernard Murray challenged his jury conviction on five counts of mail fraud pursuant to 18 U.S.C. § 1341. The indictment charged that appellant had committed mail fraud arising out of false insurance claims he had filed with the United States Aviation Insurance Group (USAIG) wherein he alleged the loss of expensive equipment from his aircraft, first by theft and next by fire.

A brief review of the evidence presented at trial is appropriate. Subsequent to purchasing a Piper Arrow aircraft from Pontiac Piper, Inc., in September 1979, appellant directed Michigan Aviation, Inc., to install into the craft two radios, an audio panel, a transponder, and distance measuring equipment (DME). The serial numbers of the equipment were recorded by the seller, Pontiac Piper. Appellant insured the plane and equipment with USAIG through an intermediary agency.

In March of 1980, appellant reported the theft of several items of the avionic equipment from his Piper Arrow aircraft. An investigating officer prepared a report from information supplied by appellant, which information incorporated the description and some serial numbers of the allegedly stolen equipment. On April 15, 1980, appellant obtained an estimate of the value of the stolen equipment from Michigan Aviation, which he forwarded to USAIG. USAIG thereafter honored appellant's claim in the amount of $9,719.03, which included payment for a stolen DME and audio panel.

The replacement equipment purchased from Michigan Aviation was actually installed on April 3, 1980, antedating the estimate. The bill for the replacement equipment purchased from Michigan Aviation totalled $6,949.50. Neither a DME nor an audio panel were purchased at that time, although the price of these items was included in appellant's estimate dispatched to USAIG. A DME was, however, installed on that date by Michigan Aviation, but appellant himself supplied the equipment. No audio panel was installed because the aircraft already had one on the date the replacement equipment was installed.[1] The employee of Michigan Aviation who installed the DME on April 3, 1980 observed that the plate on which the instrument serial number was stamped had been broken off at one end so as to eliminate the last digit of the number. The DME was the only item installed that was obviously not a new instrument.

Appellant's aircraft was subsequently destroyed by fire on October 12, 1980. The Michigan State Police Crime Laboratory determined that gasoline detected at the scene was not aviation fuel but was similar to fuel used in motor vehicles. A partially burned newspaper near the site of the conflagration appeared to have been used to ignite the fire. All interior equipment was destroyed beyond repair. The locked aircraft contained no DME or fuel computer; charred surfaces on the inside of the slots accommodating that equipment indicated that the instruments had been removed prior to the fire. An investigation disclosed that the aircraft had been flown on October 8, 1980, four days before the fire, and that the instruments were intact and operational at the time of the flight.

Appellant submitted a repair estimate of the burned equipment to Pontiac Piper which forwarded the completed estimate to

---

1. Appellant later explained that the audio panel had not in fact been stolen despite its presence on the USAIG claim application, but had been located under the seat after the insurance claim had been filed. Appellant justified his failure to report the discovery by rationalizing that the total damage to the aircraft, in reality, exceeded that which he had initially reported, consequently he was attempting to minimize his actual damages.

USAIG. The estimate presented to USAIG by appellant through Pontiac Piper fixed repair costs at approximately $55,000. USAIG made payment to appellant in the amount of $68,513.10, the full value of the aircraft.

FBI Agent William Sievers conducted an investigation of the fire with appellant's permission. He testified that the two radios that had been burned in the fire had the same serial numbers as the two originally installed by appellant in the aircraft at the time of purchase and which had been reported stolen in March of 1980. Additionally, the two legible digits of the serial number of the audio panel which had suffered fire damage corresponded to those of the equipment originally installed and reported stolen from the aircraft during March of 1980. Also, the four legible digits of the five digit serial number of the transponder which was also damaged during the fire corresponded to the original equipment reported stolen from the aircraft in March of 1980. In a subsequent interview with Sievers, appellant explained that he had removed the fuel computer to repair it prior to the fire. He denied any knowledge of the other missing equipment, specifically the DME.

Appellant thereafter purchased a new Piper Dakota airplane in November of 1980 from another dealer, Grosse Ile Flying Service. He directed another company, Beacon Avionics, Inc., to wire the aircraft for a DME, although none was installed by Beacon Avionics, Inc., at that time inasmuch as appellant indicated that he already owned a DME which he would install. Another pilot stated that the aircraft was equipped with a DME in December of 1980 and January of 1981 when he flew it. Appellant explained that he had installed the DME.

A later search of the Piper Dakota aircraft in January of 1981 produced a DME. The serial number plate of the DME was broken off at one end and the last digit of the number was missing corresponding to the DME serial number plate described by Michigan Aviation's employee on April 3, 1980 when he installed such an instrument in appellant's Piper Arrow aircraft subsequent to appellant's theft claim filed in March of 1980. Laboratory analysis disclosed that the serial number had been altered. In a subsequent interview, appellant claimed that he had purchased this DME for $1,200 cash from an individual named Lewandowski. He explained that he had broken off the end of the identification plate, including the final digit of the serial number, and had pencilled the serial number onto the tag because it was becoming dogearred.

The evidence taken in its entirety was sufficient to sustain a jury conviction when construed most favorably on behalf of the Government. *See Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Orrico*, 599 F.2d 113, 116–17 (6th Cir.1979). Moreover, contrary to appellant's contentions herein, this circuit has recently reaffirmed its position "that our court on appeal will reverse a judgment for insufficiency of evidence only if this judgment is not supported by substantial and competent evidence upon the record as a whole, and that this rule applies whether the evidence is direct or wholly circumstantial. It is not necessary that circumstantial evidence remove every reasonable hypothesis except that of guilt." *See United States v. Stone*, 748 F.2d 361, 363 (6th Cir.1984).[2]

On appeal appellant charged error arising from, first, the testimony of Agent Sievers wherein he made a passing reference to his request of the appellant to submit to a polygraph examination, and, second, from confusing instructions submitted to the jury.

FBI Agent Sievers in the course of testifying inadvertently employed the phrase "polygraph examination" by relating the date on which a certain conversation had occurred with an event which was fixed in

---

**2.** Appellant challenged on appeal, among other things, the sufficiency of the evidence to support the jury verdict.

his memory.[3] Defense counsel's immediate objection was sustained by the trial judge. After denying appellant's motion for mistrial, the trial judge admonished the jury to disregard the testimony with a cautionary instruction.[4]

The majority opinion correctly concludes that inasmuch as the results of a polygraph examination are not competent evidence, no abuse of discretion occurs when a trial court excludes testimony that a polygraph test had been conducted. *See United States v. Fife*, 573 F.2d 369, 373 (6th Cir. 1976), *cert. denied*, 430 U.S. 933, 97 S.Ct. 1555, 51 L.Ed.2d 777 (1977). However, this court is not confronted with that issue in the case at bar. Rather, the issue joined herein is the effect upon the jury of Sievers' inadvertent reference to a request made of appellant to submit to a polygraph examination and whether such reference constituted reversible error. In my opinion the controversial testimony was harmless beyond a reasonable doubt. *See Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). Appellant's contention that the FBI agent's statement was an intentional attempt to prejudice his case is unsupported in the record and derived solely from appellant's own speculation based on the fact that Sievers was an experienced law enforcement officer. In sum, since the remark was ambiguous, unprompted, and apparently inadvertent, and since the jury was immediately instructed to disregard it, and since the evidence against appellant was substantial, Siever's comment did not rise to the level of reversible error.[5]

Appellant's second assignment of error concerning the jury instructions merits consideration. Appellant has directed this court's attention to two instances in the transcript wherein the jury instructions misstated the Government's reasonable doubt standard of proof. Initially, the instructions observed that it was "not required that the Government prove guilt beyond a reasonable doubt, all possible doubt." Thereafter, in another section of the instruction, the court again misstated the Government's burden by instructing the jury that the law "requires that the jury find the acts in accordance with the *preponderance of the evidence* in the case, both direct and circumstantial." (emphasis supplied).

Individual jury instructions must be viewed in the context of the overall charge and may not be judged in artificial isolation. *Cupp v. Naughten*, 414 U.S. 141, 146–47, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973) (habeas review). Applying this standard of review to the matter at bar, it cannot be said with any degree of certainty that an ordinary layman would not have been confused by the patently erroneous and conflicting phrasings of the Government's burden of proof to such an extent as to substantially influence the jury's ultimate verdict. Accordingly, the court is constrained to reverse appellant's jury conviction on this ground. *See Kotteakos v. United States*, 328 U.S. 750, 764–65, 66 S.Ct. 1239, 1247–48, 90 L.Ed. 1557 (1946).

Based on the foregoing, I concur in the majority's remand of the case for new trial. I write separately only to express my views that the witness' polygraph reference would not in itself have justified a reversal on this record.

---

3. The passage consisted of the following:
   Q. Did that occur on that particular day that he stopped by your office?
   A. No, when I asked him if he would submit to a polygraph examination—
   Mr. Howard [defense counsel]: Well, I'm going to object to that, your Honor.
   The Court: I will sustain it.

4. The instruction stated:

"The jury will be instructed to completely wipe that statement out of your minds, ignore it completely."

5. Appellant's related claims of governmental misconduct with respect to the obtaining of the testimony at trial of Michael Crabill, an employee at Michigan Aviation, Inc. and appellant's contention that the government's investigation of the case was one-sided are similarly without merit.