899 F.2d 15
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
John M. CARNICLE, Defendant-Appellant.
 No. 89-5295.
 United States Court of Appeals, Sixth Circuit.
 April 3, 1990.
 
 Before KEITH and ALAN E. NORRIS, Circuit Judges, and CHARLES W. JOINER, District Judge*
 PER CURIAM:
 
 
 1
 Defendant John M. Carnicle ("Carnicle") appeals from the district court's March 9, 1989 judgment and commitment order charging him with uttering counterfeit obligations. For the reasons stated below, we AFFIRM the district court's judgment.
 
 I.
 
 2
 Carnicle's conviction is the outcome of events that occurred during a four day period from Friday, August 5 through Monday, August 8, 1988 in Nashville, Tennessee. On August 5, 1988, while at Pargo's Restaurant and Bar in Goodlettsville, Tennessee, Carnicle sold four counterfeit $100 bills to Randy Horton ("Horton") for $98. Carnicle told Horton that he was interested in selling more counterfeit bills. The next day, Horton met his friend Randall Jennings ("Jennings"), told him about purchasing the counterfeit bills from Carnicle, and gave Jennings the four counterfeit bills.
 
 
 3
 On that same day, Horton and Jennings made independent attempts to contact law enforcement officials and inform them about Carnicle's plan to sell more counterfeit bills. After Jennings was unable to contact Detective Don Badencour ("Badencour"), of the Sumner County Sheriff's Office, he feared possessing the counterfeit bills and burned them.
 
 
 4
 Jennings eventually contacted Badencour at the Sumner County Sheriff's Office on Sunday, August 7, 1988. Since Jennings had destroyed the counterfeit bills, Badencour asked whether he could obtain another counterfeit bill. That night, Horton and Jennings met with Carnicle and purchased another $100 counterfeit bill. With the cooperation of Horton and Jennings, Badencour and several other Drug Enforcement Administration ("DEA") agents planned a set-up whereby Secret Service Agent Michael Keen ("Keen") would purchase a counterfeit bill from Carnicle.
 
 
 5
 On the night of August 8, 1988, Horton, Keen and Jennings arrived at Pargo's restaurant. Keen and Jennings were wired so that DEA agents outside of the restaurant could listen to their conversations with Carnicle. Carnicle and Lloyd Harold Goode ("Goode")[1] arrived at the restaurant and Jennings told them that Keen was a potential buyer. Carnicle instructed Goode and Horton to determine whether Keen was a police officer. Carnicle then sent Goode to Keen's table to conduct preliminary price negotiations. After a brief conversation, Goode left the table and Carnicle came to the table and instructed Horton and Jennings to leave. Carnicle and Keen negotiated and agreed upon a price, and Carnicle explained to Keen how he could pass counterfeit bills without getting caught. Thereafter, both men left the restaurant. Once outside, Carnicle retrieved a napkin, hidden near a garbage dumpster, that contained the counterfeit money and offered it to Keen. Once Keen determined that the bills were counterfeit, he signaled the other DEA agents who then arrested Carnicle.
 
 
 6
 On August 11, 1988, Carnicle was indicted in a one count indictment for uttering counterfeit obligations, in violation of 18 U.S.C. Sec. 472. Carnicle pled not guilty and was ordered detained until trial. Trial was initially scheduled for September 16, 1988, but Carnicle waived his speedy trial rights and the trial date was changed to December 5, 1988.
 
 
 7
 Carnicle filed several pre-trial motions, including a pro se motion for appointment of new counsel. A hearing was held on December 5, 1988 and the district court denied the motion and ordered the case continued until January 23, 1989. A jury trial was held from January 23 through 24. At trial, a recording of the conversations between Carnicle and Keen was presented as evidence. The jury returned a verdict finding Carnicle guilty of uttering counterfeit obligations. On March 8, 1989, the district court sentenced Carnicle to 33 months imprisonment, a term of three years supervised release and imposed a special assessment fee of $50. A timely notice of appeal was filed on March 9, 1989.
 
 II.
 
 8
 Carnicle contends that because the district court erred in refusing to grant his pro se motion for appointment of new counsel, he was denied effective assistance of counsel. He argues that the communication and personality conflicts between him and his appointed defense counsel, Michele D. Collins ("Collins"), culminated in irreconcilable differences about how to handle and present his case. Carnicle insists that since he was unable to develop a rapport with Collins he was denied effective assistance of counsel. We find Carnicle's argument unpersuasive.
 
 
 9
 The burden is on the defendant to prove ineffective assistance of counsel. See, e.g., Strickland v. Washington, 466 U.S. 668, 689 (1984); Paprocki v. Foltz, 869 F.2d 281, 287 (6th Cir.1989); Browning v. Foltz, 837 F.2d 276, 281-82 (6th Cir.1989), cert. denied, --- U.S. ----, 109 S.Ct. 816, (1989); Stamps v. Rees, 834 F.2d 1269, 1276 (6th Cir.1987), cert. denied, --- U.S. ----, 108 S.Ct. 1279 (1988). The criteria for judging any claim of ineffective assistance of counsel is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland, 466 U.S. at 686. The defendant's burden of proof is twofold. First, the defendant must prove that counsel's assistance was ineffective or deficient by specifying counsel's unreasonable acts or omissions. See id. at 690. Second, the defendant must prove that counsel's ineffective assistance undermined the adversarial process by prejudicing the defense and thereby depriving him of a fair trial. See Stamps, 834 F.2d at 1276; see also Strickland, 466 U.S. at 687 ("[T]he defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."). Moreover, there is a strong presumption that "counsel's conduct falls within the wide range of reasonable professional assistance." Paprocki, 869 F.2d at 287 (quoting Strickland, 466 U.S. at 689).
 
 
 10
 Carnicle failed to meet the first prong of his burden of proof as he did not challenge any of Collins' specific acts or omissions. He gave no detail as to what the differences in opinion were or how these alleged differences affected case tactics. Certainly, a mere assertion that there was a personality conflict that caused differences of opinion on how to present the case is insufficient to meet the Strickland standard.
 
 
 11
 In fact, the district court found that any ineffectiveness of representation was due to Carnicle's own uncooperative behavior.[2] In accordance with Carnicle's instructions to present a duress defense, Collins investigated all of his potential witnesses and assessed the value of their testimony to select those who would testify at trial. She followed Carnicle's instructions on trial strategy, conferred with him on the jury selection and sentence hearing decisions, and even convinced the court to question the jury as to whether any of them had seen Carnicle on the television news broadcasts.
 
 
 12
 Carnicle also did not meet the second prong of the burden of proof as he presented no evidence to show that the trial's outcome might have been different but for Collins' assistance. Given our thorough review of the record, we find the evidence shows that Collins was a strong and effective advocate; therefore, Carnicle's ineffective assistance of counsel claim must fail.
 
 III.
 
 13
 Carnicle alleges that the government committed reversible error when, on cross-examination, it questioned him on a polygraph test he offered to take in connection with this case. He argues that the district court either should have admonished the jury or granted a mistrial sua sponte. We disagree.
 
 
 14
 The introduction of polygraph results into trial constitutes error. See United States v. Fife, 573 F.2d 369, 373 (6th Cir.1976), cert. denied, 430 U.S. 933 (1977); see also United States v. Murray, 784 F.2d 188, 189 (6th Cir.1986) ("This Circuit holds an introduction of polygraph material to be error."). Here, however, neither party introduced any polygraph results into trial. In fact, Carnicle introduced the polygraph issue on direct testimony in explaining how he became involved with the law enforcement authorities and to support his claim that he was working undercover at the time of his arrest.[3] Since Carnicle raised the polygraph issue, the government, on cross examination, merely asked questions to confirm his statements. We have held that at trial, the mere discussion of a polygraph test does not constitute reversible error. See Murray, 784 F.2d at 189. Therefore, Carnicle's statements of the polygraph test and the government's cross-examination addressing it did not constitute reversible error.
 
 IV.
 
 15
 Carnicle submits that the district court erred in calculating the offense level applicable to his conviction. Specifically, he alleges: first, that the district court failed to decrease his offense level for his acceptance of responsibility; second, that the district court improperly concluded that he was the organizer or leader in the crime; and third, that the district court improperly found that he obstructed or impeded the trial proceedings. Therefore, under Carnicle's analysis of the facts presented, he contends that he should have had a sentencing range of 10 to 16 months and not a 27 to 33 month range. We are not persuaded.
 
 
 16
 18 U.S.C. 3742(e) provides that the standard of review is that this court shall "accept the findings of fact of the district court unless they are clearly erroneous." We have held that a finding is clearly erroneous when "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. Perez, 871 F.2d 45, 47-48 (6th Cir.1989) (quoting Archer v. Macomb County Bank, 853 F.2d 497, 499 (6th Cir.1988)). In the present case, however, Carnicle failed to assert that the district court's findings of fact were clearly erroneous or that the court made a mistake. As we find his arguments frivolous, we will briefly address each claim.
 
 
 17
 Section 3E1.1(a) of the United States Sentencing Commission Guidelines Manual (hereinafter "Guidelines") provides a reduction of two offense levels for a defendant's acceptance of responsibility. Here, the district court refused to award this reduction as it determined that Carnicle was "playing games with [the] court". Trial Transcript at 10, 31. On appeal, Carnicle argues that his admission that he passed counterfeit money, demonstrates his acceptance of responsibility. Carnicle, however, never admitted that he had the requisite criminal intent when he uttered the counterfeit obligations--acknowledging intent is inherent in accepting responsibility for this crime.[5] Since Carnicle did not acknowledge his intent in uttering the counterfeit obligations, he did not accept responsibility for his crime.
 
 
 18
 From the record below, it is evident that Carnicle controlled others and was the key figure in negotiating the deal with Keen. He convinced Horton to purchase counterfeit bills. On the night of his arrest, Carnicle directed Horton and Jennings to leave him and Keen alone to negotiate a deal. At trial, Jennings testified that Goode had to receive Carnicle's approval before embarking on a sale. Trial Transcript at 79. Moreover, before entering the restaurant, Carnicle instructed Goode on where to hide the counterfeit bills. The record supports a finding that Carnicle was the leader and organizer of this operation. Any claims to the contrary do not support a conclusion of clearly erroneous error by the district court.
 
 
 19
 The Guidelines provide that an increase of two offense levels is appropriate for a convicted defendant who willfully obstructed or impeded the administration of justice. See Guidelines, Sec. 3C1.1. Actions designed to mislead those in the judicial proceeding and untruthfull testimony are examples of actions constituting the willful obstruction of justice. See Guidelines, Commentary to Sec. 3C1.1.
 
 
 20
 Certainly, when computing a defendant's sentence, the district court has the authority to assess the defendant's truthfulness. The district court disbelieved Carnicle's "secret service" defense and concluded that he was playing games with the court. Because the district court found Carnicle's defense untrue, it added two points to his offense level.[6] Here again, Carnicle failed to show that the court's finding is clearly erroneous. Since he presented no evidence to the contrary, we find that the district court correctly concluded that Carnicle obstructed justice and modified his sentence appropriately.
 
 V.
 
 21
 From a thorough analysis of the record, we find that Carnicle received effective assistance of counsel, as guaranteed by the Sixth Amendment. On direct testimony, Carnicle introduced the polygraph issue. He failed to establish that the government's cross-examination on his polygraph test claim was improper, as the mere discussion of a polygraph test does not constitute reversible error. Furthermore, given Carnicle's failure to accept responsibility for his crime, his leadership role in the offense and his untruthfulness in the district court proceedings, the district court imposed the proper sentence under the Guidelines.
 
 
 22
 For the foregoing reasons, we AFFIRM the judgment of the Honorable Thomas A. Wiseman, Jr., Chief Judge of the United States District Court, Middle District of Tennessee.
 
 
 
 *
 The Honorable Charles W. Joiner, United States District Judge for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 Goode is Carnicle's friend and was present at the initial sale of counterfeit bills to Horton. Goode is also the co-defendant in this indictment
 
 
 [2]
 At the hearing on the motion for new counsel, Collins stated that Carnicle refused to show her the written account of his testimony and refused to communicate with her to the extent that she did not know what he would say when he took the witness stand. Hearing Transcript (Dec. 5, 1988) at 10-13. At trial, Collins stated that after the trial was continued, she met with Carnicle to prepare for trial. At this meeting Carnicle refused to cooperate, stated he did not want her as his counsel, and walked away. Trial Transcript at 9
 
 
 [3]
 At trial and in his brief, Carnicle maintains that he lacked the criminal intent to commit the crime as his actions were the result of his cooperation with the government. Carnicle testified that his brother, who is involved in a counterfeiting ring in Salt Lake City, Utah, wanted him to join his organization and threatened Carnicle with bodily harm. In April 1988, Carnicle contacted the Federal Bureau of Investigations and later the Secret Service in Salt Lake City and agreed to attempt to infiltrate his brother's ring. He alleges that he was cooperating with the Secret Service at the time of his arrest and that Secret Service agent Lynn Holliman ("Holliman") instructed him that if he engaged in illegal activity outside of the state, he should maintain his cover and contact Holliman after the transaction. Holliman was not aware that Carnicle was travelling to Nashville, Tennessee. The last contact Holliman had with Carnicle was in July 1988
 
 
 [5]
 18 U.S.C. Sec. 472 provides, in pertinent part:
 Sec. 472. Uttering counterfeit obligations or securities
 Whoever, with intent to defraud, passes, utters, publishes, or sells, or attempts to pass, utter, publish, or sell, ... any falsely made, forged, counterfeited, or altered obligation or other security of the United States, shall be fined not more than $5,000 or imprisoned not more than fifteen years, or both.
 
 
 [6]
 At trial, Holliman stressed that Carnicle was not always truthful and characterized him as unreliable. Trial Transcript at 198