952 F.2d 408
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Thomas Howard REDLING, Defendant-Appellant.
 No. 91-50016.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Nov. 5, 1991.
Decided Jan. 6, 1992.
 
 Before SNEED, BEEZER and TROTT, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 Thomas Howard Redling appeals his conviction under 18 U.S.C. § 2113(a) of robbing a San Diego branch office of the Bank of America of $435.49. Mr. Redling was sentenced to seventy-eight months and a $10,000 fine by the district court. He challenges both his conviction and his sentence. This court has jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742. We affirm.
 
 I.
 FACTS AND PROCEEDINGS BELOW
 
 3
 On January 2, 1990, a Bank of America branch office in San Diego was robbed at gunpoint. Twenty-four days later, Moana Eisert filed a Crime Stoppers Anonymous tip that led to appellant's arrest and indictment. In the tip, Ms. Eisert alleged that she had seen what looked like a demand note in a typewriter appellant had been using, that she had heard from a friend that appellant had robbed a bank of about four hundred dollars, a portion of which was in two-dollar bills, and that appellant had given her one of the two-dollar bills. Later, through an arrangement between Eisert and Crime Stoppers, she produced a two-dollar bill to the police and it was found to match bait money taken in the robbery. Based on the tip and the matching bill, the FBI mounted an investigation which culminated in the trial below.
 
 
 4
 At trial, the government first sought to establish appellant's identity through eyewitness testimony of the robbery. These efforts met with mixed success. Some confusion arose over a clown-like wig appellant was alleged to have worn during the robbery and whether the robber had been wearing dark glasses. The combined testimony of three people, Debra Hidalgo, Moana Eisert, and Monique Mooney, however, supported the prosecution. It tended to show the following facts.
 
 
 5
 Ms. Eisert owned a duplex in which she lived in one half and rented the other to appellant and his wife, Mary. The duplex contained common areas in which there was a game room and a typewriter, and it was possible to walk freely from one part of the duplex, through the common area, to the other. Ms. Eisert, appellant, and his wife were all friends.
 
 
 6
 On January 1, 1991, Debra Hidalgo went to the Eisert duplex to visit both the Redlings and Ms. Eisert. There she encountered appellant listening to a police scanner. She testified that appellant told her he was desperate for cash and that he was going to rob a bank.
 
 
 7
 The following morning, the day of the robbery, Ms. Hidalgo returned to the Eisert duplex to find appellant trying on various suits of clothes and attempting to conceal a .357 magnum under his jacket in a shoulder holster and a .25 automatic under his pants leg in an ankle holster. She also saw two wigs, one of them clown-like, and crumpled papers by the typewriter.
 
 
 8
 Ms. Eisert testified that, later that afternoon, appellant came home in a very excited state, that he pulled a wad of money from his pocket which contained a number of two-dollar bills, and that he stated he had just robbed a bank. He then proceeded to pay Ms. Eisert part of the rent he owed her from the wad, and also gave her a two-dollar bill as a novelty.
 
 
 9
 Ms. Mooney testified that appellant had given her some two-dollar bills on the evening of the robbery, and that she then went to a bar and spent them. Ms. Hidalgo claimed to have accompanied Mooney to the bar and affirmed seeing her spend the bills. Also, Ms. Eisert claimed that Mary Redling had admitted that her husband had robbed a bank.
 
 
 10
 On cross-examination Ms. Hidalgo had trouble explaining why she neglected to tell the FBI agents in her first interview with them of appellant's January 2 comment that he intended to rob a bank, and why she did not mention seeing Mooney spending two-dollar bills at a bar that evening. Eisert, for her part, had difficulty explaining why she did not call Crime Stoppers until the day appellant moved out of her duplex after a fight over rent money. She also denied having any sexual relationship with appellant or any anger toward him for moving out.
 
 
 11
 Two witnesses testified on appellant's behalf. First, Paul Smith stated that he was with appellant the entire day of the robbery fixing Smith's car in Smith's driveway. Next, appellant's father testified that on January 25, one day before Ms. Eisert called Crime Stoppers for the first time, he was helping his son move out of the duplex and that Ms. Eisert furiously demanded appellant pay her the money he owed her.
 
 
 12
 The appellant testified that he had had a brief sexual relationship with Eisert during a separation from his wife, and that she was angry with him for ending it and returning to his wife. It was his belief that Eisert had conspired with Hidalgo and Mooney to frame him for the robbery that one Jason Dan Latil committed. In an effort to support this theory, a photo of Latil was shown to the jury, and Latil himself was dressed up in the robber's likely clothing in open court.
 
 
 13
 After two days of deliberation, the jury reported that it was unable to come to a unanimous decision. The court, over defense objection, issued a modified Allen charge. One and one-half hours later, the jury returned a conviction. Appellant is currently in custody serving his seventy-eight months.
 
 II
 ISSUES
 
 14
 A. Was There Error in Admitting the Prior Guilty Plea?
 
 
 15
 Appellant contends that the introduction of a state court guilty plea, that had not yet been formally entered as a conviction at the time of the trial, cannot, as a matter of law, be used to impeach appellant's credibility under Fed.R.Evid. 609(a).[1]
 
 
 16
 We disagree. Recent circuit authority establishes that appellant, by testifying himself about the state court plea during his direct examination, has waived his right to object to such impeachment. See United States v. Williams, 939 F.2d 721 (9th Cir.1991). At trial, but before appellant's direct examination, the district court ruled that it would allow the government to impeach his credibility with the introduction of a state methamphetamine drug charge to which he pleaded guilty but had not yet been convicted or sentenced. Perhaps to soften the sting of the guilty plea evidence, appellant's trial counsel elicited the fact of the plea on direct examination. During his cross-examination, the government also went into the guilty plea in an effort to impeach appellant's credibility.
 
 
 17
 Williams is not distinguishable. There the district court ruled in limine that a defendant's prior state marijuana conviction would be admissible to impeach the defendant's credibility. As a matter of trial strategy, defense counsel elicited the conviction on direct examination. On appeal, Williams argued that the in limine ruling was error and that it forced him to bring a fact to the jury he otherwise would have been able to conceal. The Williams court rejected the argument and found that Williams waived any right to appeal the in limine ruling by going into the matter on direct. The court noted that "[w]hile the choice between preempting the prosecution and preserving the Rule 609 objection for appeal may be perilous, it is no more so than many other decisions defense attorneys must make at trial." Id. at 725.
 
 
 18
 We find Williams controlling; any substantive challenge to the Rule 609(a) evidence has been waived.
 
 
 19
 B. Did the Government Exceed the Proper Scope of Rule 609 Evidence?
 
 
 20
 Appellant next argues that the court incorrectly allowed the prosecution to question him about whether he also had blamed Jason Dan Latil for his state criminal drug charge. Appellant argues that Rule 609(a) impeachment evidence must be narrowly drawn because "excessive exploration by the government of the circumstances and details of prior criminal conduct may be so prejudicial as to amount to plain error." United States v. Roenigk, 810 F.2d 809, 814 (8th Cir.1987).
 
 
 21
 Rule 609 allows the prosecution to attack the credibility of a witness through evidence of prior serious crimes. However, the question of whether appellant blamed Jason Dan Latil also goes to appellant's possible bias against Jason Dan Latil, and could explain why Latil was blamed for the robbery. Evidence of bias is a permissible and established basis of impeachment. See United States v. Abel, 469 U.S. 45, 49-52 (1984). As such, its admissibility is subject only to Fed.R.Evid. 403 and not the more stringent 609(a) test.
 
 
 22
 In his reply brief appellant argues that the government "sandbagged" his defense by not disclosing to the trial court at the time of its ruling on 609 admissibility that the government intended to go into the state guilty plea. Thus, appellant now contends that the government unfairly surprised the defense after appellant had taken the stand. This contention is without merit. Appellant's counsel immediately objected to the line of questioning and was overruled. Any damage arising from the nondisclosure would have occurred in any event because the court found the questioning permissible.
 
 
 23
 The remaining question is whether the trial court incorrectly allowed the Latil bias questioning under Rule 403. Because appellant squarely attempted to pin the current crime on Latil, we hold that the admission of evidence of a similar previous attempt was within the court's sound discretion. Rule 403 was properly observed.
 
 
 24
 C. Should the District Court Have Granted a Mistrial?
 
 
 25
 Appellant's third argument is that the district court twice erred in refusing to grant a mistrial when government witnesses, during cross-examination by the defense, mentioned that they had taken polygraph tests during the FBI investigation. We review the court's refusal to grant a mistrial for an abuse of discretion. See United States v. Segal, 852 F.2d 1152, 1155 (9th Cir.1988).
 
 
 26
 During the pendency of the trial, appellant took two separate polygraph tests. In both he denied committing the robbery and "passed conclusively." Moana Eisert and Debra Hidalgo also took polygraph tests which were administered by the FBI during its investigation, and which were "inconclusive" in establishing whether their stories were true. Before the trial, the government provided appellant's counsel with both FBI polygraphs together with the name of the FBI interviewer on each occasion.
 
 
 27
 In a pretrial motion, defense counsel requested that all polygraph evidence be admitted as tending to establish appellant's innocence. This motion was denied. Both sides were instructed that "polygraphs should not be mentioned by anybody in any circumstances," and that both sides should "plan accordingly."
 
 
 28
 In the cross-examination of Hidalgo, the following exchange took place:
 
 
 29
 Q: [This FBI Report] indicates that it's an investigation of an interview of you, on April 5; is that correct?
 
 
 30
 A: True.
 
 
 31
 Q: You came down to the courthouse or the FBI's office building on the 24th of April for another interview; is that correct?
 
 
 32
 A: True.
 
 
 33
 Q: Those are the two times that you talked to the police, right?
 
 
 34
 A: Yes.
 
 
 35
 Q: And that was at their initiation, am I right?
 
 
 36
 A: Yes. So was the polygraph test that I conducted.
 
 
 37
 In a bench conference, defense counsel moved for a mistrial. The court indicated that it saw nothing "sinister" in the mention of the polygraph statement, and that it considered the witness "unsophisticated." The court offered to give as strong an admonition to the jury to disregard as defense counsel wanted, short of granting a mistrial. Counsel asked the court not to mention polygraph again, and the court simply told the jury to disregard the last answer.
 
 
 38
 A similar occurrence took place during the cross-examination of Moana Eisert. Defense counsel was probing for inconsistencies in the prior statements and interviews Eisert had given during the investigation. Using the name of the FBI polygraph administrator, counsel asked about Eisert's response to a certain question that was inconsistent with other testimony:
 
 
 39
 Q: When you talked to Agent Vardell, you admitted to him that you had not heard any discussion at O'Connell's bar about a bank robbery in which two-dollar bills had been taken; is that right?
 
 
 40
 A: I don't remember telling him that. I was nervous. I didn't know what this polygraph thing was going to be like.
 
 
 41
 The court struck the answer on its own. Later, the court also refused to grant a mistrial due to Eisert's mention of polygraph, again stating that the court did not "see any deliberate attempt by the witness to bring out polygraph or the result of it," and that defense counsel's questioning was "very searching." This time, the court offered to give as strong an admonition in the jury instructions to disregard polygraph testimony as defense desired. Counsel did not request such an instruction.
 
 
 42
 The nub of appellant's argument is that the unsolicited and stricken statements of Hidalgo and Eisert improperly bolstered their credibility by creating an inference in the jurors' minds that, because Eisert and Hidalgo had taken polygraph tests, they were therefore telling the truth. It is appellant's position that the statements were so inflammatory as to be an abuse of discretion on the part of the trial court not to grant an immediate mistrial.
 
 
 43
 In support of his theory, appellant relies on United States v. Candoli, 870 F.2d 496 (9th Cir.1989). In Candoli, an officer testifying on direct examination for the prosecution related that the investigation of another suspect "culminated in asking him to take a polygraph examination." Id. at 504. The district court, over defense objection, refused to strike the testimony. On appeal, Candoli argued that the testimony "caused the jury to infer that [the other suspect] had taken a polygraph examination and passed and that Candoli either refused to take one or took one and did not pass." Id. at 505. Based on the potential for harm, the court found an abuse of discretion by the district court in not striking the testimony. However, after finding that the district court's error probably did not affect the verdict, the court affirmed the conviction.
 
 
 44
 According to appellant, the reasoning of the Candoli court requires reversal here. He argues that in Candoli the accused, Ms. Candoli, only asserted that "unknown suspects" had committed the crime of arson for which she was charged. Since she did not implicate any suspect in particular, the inference that a specific suspect was innocent did not hinder or foreclose her "unknown suspects" defense. See id.
 
 
 45
 In this case, however, appellant asserts that his defense was greatly weakened by the polygraph reference because the prosecution's case rested on the credibility of Eisert and Hidalgo. Hence, if the test under Candoli is the extent of harm to the defendant's defense caused by the polygraph reference, then it follows that, because the harm was substantial in this case, the conviction should be reversed.
 
 
 46
 Were we convinced that the polygraph reference caused significant harm we would be more sympathetic to appellant's argument. We are not so convinced. The decision of the trial court to deny the motion for mistrial and proceed with the trial is precisely the kind of decision that, absent unusual circumstances, should be made by the trial judge.
 
 
 47
 No such circumstances existed here. The trial judge offered to give curative instructions if the appellant so wished. His counsel declined, believing, no doubt, that the instructions would do more harm than good.
 
 
 48
 The errant testimony consisted of but a few lines in a transcript that takes up some 500 pages. Moreover, the trial court observed on both occasions that it felt the testimony was purely accidental. It considered Hidalgo an "unsophisticated witness," and felt that the Eisert testimony was the "product of a very searching cross-examination." We would look at the case differently were there evidence that Hidalgo or Eisert acted purposely or in concert to prejudice the jury. See, e.g., United States v. Murray, 784 F.2d 188 (6th Cir.1986) (finding incurable error where an experienced FBI agent who knew that mention of polygraph evidence was improper, mentioned the polygraph evidence purposely in an effort to bolster the prosecution). There was no such showing of improper witness conduct here.
 
 
 49
 D. Was There an Evidentiary Error Under Rule 801(d)(1)(B)?
 
 
 50
 Appellant next argues that the district court improperly allowed the government to bolster the prior testimony of one of its witnesses through the introduction of a prior consistent statement, in contravention of Fed.R.Evid. 802(d)(1)(B). We review the admissibility of the evidence for abuse of discretion. See United States v. Miller, 874 F.2d 1255, 1271 (9th Cir.1989).
 
 
 51
 Rule 801(d)(1)(B) provides in pertinent part: "A statement is not hearsay if ... [t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is ... consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive ..." This circuit has applied the rule in a straightforward manner. See, e.g., id.
 
 
 52
 During the cross-examination of Moana Eisert, defense counsel sought to impeach her by demonstrating inconsistencies between statements she had made to "Crime Stoppers," to the FBI, and those given at the trial. In this effort counsel elicited the statement by Eisert that Mary Redling had told her that appellant committed the robbery. When asked whether she had told "Crime Stoppers" that, Eisert said "no" and "I didn't give no names out." Counsel then proceeded to inquire about a statement in which Eisert had recounted a conversation at a local bar concerning two-dollar bills. To impeach Eisert's statement counsel sought to use a portion of an FBI report by Agent Vardell. The prosecution then sought to use other portions of the Vardell report to rehabilitate Eisert by pointing out consistencies between the statements of Eisert. The prosecution read the entire Vardell report into the record and drew on it extensively in closing argument.
 
 
 53
 Appellant now seeks to overturn the jury verdict below on the basis of the introduction of the entire report. He maintains that the government improperly bolstered Eisert's trial testimony, and that the report contained inadmissible hearsay not within the Rule 801(d)(1)(B) exception. In response, the government argues that defense counsel attempted to impeach Eisert's hearsay testimony regarding Mary Redling's statements, and that the disputed portion of the report in question was therefore admissible pursuant to the express terms of Rule 801(d)(1)(B). A review of the transcript indicates that the government's position is correct.
 
 
 54
 We have no doubt that defense counsel sought to show that Eisert was making up the entire business about a conversation with Mary Redling. Thus, the consistent statement in the FBI report relating the Mary Redling-Moana Eisert exchange is defined nonhearsay and admissible under the rules.
 
 
 55
 Moreover, defense counsel questioned Eisert about her relationship with appellant, and accused her of being involved sexually with him. Thus, defense effectively called into question her motive for testifying to the hearsay statement of Mary Redling. To rebut allegations of improper motive, Rule 801(d)(1)(B) expressly allows the introduction of prior consistent statements; the statement was, therefore, properly admitted.
 
 
 56
 E. Was the Issuance of the Modified Allen Charge Reversible Error?
 
 
 57
 Appellant's final challenge to his conviction revolves around the court's use of what is known as a "modified Allen charge."[2] Generally, we review jury instructions for an abuse of discretion. See United States v. Linn, 880 F.2d 209, 217 (9th Cir.1989). The test for whether an Allen charge is proper is whether "in its context and under all the circumstances" it has a coercive effect upon the jury. United States v. Beattie, 613 F.2d 762, 764 (9th Cir.) (quoting Jenkins v. United States, 380 U.S. 445 (1965)), cert. denied, 446 U.S. 982 (1980). This circuit evaluates coerciveness on the basis of (1) the form of the instruction, (2) the period of deliberation following the Allen charge, (3) the total time of jury deliberations, and (4) the indicia of coerciveness or pressure on the jury. Id.
 
 
 58
 Appellant does not challenge the form of the Allen charge. Rather, he argues that in the context of the case and under all the circumstances surrounding the jury's deliberation, the issuance of an Allen charge was reversible error. Specifically, he contends that the above third and fourth factors point to undue coercion.
 
 
 59
 The district court gave this case to the jury the afternoon of Thursday, August 2, 1990. On Friday, just before lunch, the jury asked the court if it could view the bank surveillance film another time. This request was denied. Later that day at about 1:30 p.m., the court received a note from the jury signed by the foreman and one of the jurors that asked whether someone who felt she "was doing no good in here" could be relieved. The court brought the entire jury before it and answered, "No." At that time, the named juror attempted to repeat the question, but the court cut her off. The jury then immediately sent the court another note asking to view the appellant dressed in a coat like the one depicted in the bank surveillance film, and with glasses on, and then off. The court refused. At 3:30 p.m. the jury asked if it could have read to them the entire testimony of appellant and Paul Smith. This request was granted at 9:00 a.m. the following Monday. After lunch that day, the jury reported it was unable to "come to a unanimous conclusion." The court then gave, over defense objection, the Allen charge. After one and one-half more hours of deliberation, the jury returned a guilty verdict.
 
 
 60
 Appellant argues that the one and one-half hour time span between charge and verdict indicates undue coercion. Specifically, appellant points to United States v. Contreras, 463 F.2d 773 (9th Cir.1972), in which this court found that a thirty-five minute gap indicated coerciveness in the context of that case. A review of the case law since Contreras, however, shows that a one and one-half hour gap in the context of a two day deliberation is not particularly unusual. See, e.g., United States v. Hooten, 662 F.2d 628 (9th Cir.1981) (six-day trial; three-day deliberation; Allen charge received in morning, verdict returned same afternoon); Beattie, 613 F.2d at 762 (twelve-hour total deliberation; three and one-half hour gap between verdict and Allen charge). Moreover, we think comparison to time spans of other cases is only marginally useful in applying the third factor of the Beattie test. A more meaningful application of Beattie requires a focus on the particular facts at hand. In light of the moderate length and complexity of this case as reflected in the record, we cannot say that a one and one-half hour gap between charge and conviction is indicative of coercion.
 
 
 61
 The fourth Beattie factor, whether there are other significant indicia of coerciveness or pressure, merits close scrutiny in this case. If it is apparent that the court's instruction was directed at the juror who "felt she could do no good," there would be improper coercion. In support, appellant relies on United States v. Sae-Chua, 725 F.2d 530 (9th Cir.1984). In Sae-Chua, the court received a note from the foreman indicating that eleven jurors were in favor of conviction, but that one remained intransigent. The identity of this juror was made known to the court (and, conversely, the juror was aware of this fact) when the court polled the jury as to whether they believed a verdict could be reached, and only one juror gave a negative response. Id. at 531. Immediately thereafter, the court issued an Allen charge and the defendant was convicted. We overturned the conviction on the grounds that the judge was aware of the "nature and extent of the numerical division," and that the intransigent juror in all likelihood believed that the charge was directed at him solely. See id. at 531-32.
 
 
 62
 Appellant argues that the trial judge was aware of the identity of a single intransigent juror because of the juror's outburst detailed above. And, appellant adds, the juror knows the judge knows.
 
 
 63
 This overstates the case. At the time of the outburst the record indicates that the judge was not aware of the nature of the juror's position, or whether that juror held the sole contrary view of the case. Rather, the judge knew only that a single juror felt she could "do no good." Moreover, the charge was given after three days and eight hours of deliberation time subsequent to the court's refusal to dismiss the single juror. We think the lapse of time between the juror outburst and the Allen charge, the absence of mutual knowledge between judge and intransigent juror regarding the nature of that juror's views, and the judge's unawareness of a numerical division in the jury, sufficiently insulate the use of the Allen charge from a finding of abuse of discretion.
 
 
 64
 F. Was the District Court's Upward Adjustment of Appellant's Sentence Proper?
 
 
 65
 Appellant's final complaint is that his two-level upward adjustment of his sentence under Sentencing Guideline § 3C.1[3] for testifying falsely is unconstitutional. He argues that the provisions on which section 3C.1 rest burdened his ability to mount an effective defense and thus "tipp[ed] the scales which should be weighted in favor of the defendant in favor of the government." This is an argument that is in substance identical to one posed before this court in United States v. Barbosa, 906 F.2d 1366, 1369 (9th Cir.1990). In Barbosa, we found that the Supreme Court's decision in United States v. Grayson, 438 U.S. 41 (1977), foreclosed constitutional challenge of section 3C1.1 when it held that a judge could consider false testimony during trial in assessing punishment. Barbosa is binding precedent and we must follow it.
 
 
 66
 Appellant presses us further, arguing that the Barbosa court incorrectly applied Grayson and should be overturned. That we cannot do. Only an en banc panel of this court can do that.
 
 
 67
 AFFIRMED.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 At the time of trial the rule provided:
 For the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a crime shall be admitted if elicited from the witness or established by public record during cross-examination but only if the crime (1) was punishable by death or imprisonment in excess of one year under the law under which the witness was convicted, and the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the defendant, or (2) involved dishonesty or false statement, regardless of the punishment.
 Fed.R.Evid. 609(a) (emphasis added).
 
 
 [2]
 The substance of the charge was as follows:
 Ladies and gentlemen, I am going to ask that you resume your deliberations for a further period of time in an attempt to reach a verdict in this case. As I have told you, each of you must agree in order to return a verdict. You have a duty to consult with one another and to deliberate with a view of reaching an agreement of this can be done without violence to individual judgment. Each juror must decide the case for himself or herself; but only after impartial consideration of the evidence with your fellow jurors. During the course of your deliberations, each of you should not hesitate to examine your own views and change your opinion if convinced it is erroneous. No juror, however, should surrender his or her honest conviction as to the weight or effect of the evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict. I realize, ladies and gentlemen, you have had this case for some time; but I would ask you to consider the instruction I have just given you; and I now ask you to resume your deliberation.
 
 
 [3]
 Section 3C1.1 of the United States Sentencing Guidelines Commission Manual (U.S.S.G.C.M.) provides: "If the defendant wilfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense, increase the offense level by 2 levels." Application note 1 in turn explains:
 This provision is not intended to punish a defendant for the exercise of a constitutional right. A defendant's denial of guilt (other than a denial of guilt under oath that constitutes perjury), refusal to admit guilt or provide information to a probation officer, or refusal to enter a plea of guilty is not a basis for application of this provision. In applying this provision, the defendant's testimony and statements should be evaluated in a light most favorable to the defendant.
 U.S.S.G.C.M. § 3C1.1 application note 1. Included in a "nonexhaustive" list of conduct to which the section is meant to apply is "committing, suborning, or attempting to suborn perjury." Id. application note 3(b).