923 F.2d 855
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Ralph Hubert BARGER, Defendant-Appellant.
 Nos. 89-5606, 89-5607.
 United States Court of Appeals, Sixth Circuit.
 Jan. 23, 1991.
 
 1
 Before DAVID A. NELSON and ALAN E. NORRIS, Circuit Judges, and HIGGINS, District Judge*.
 
 
 2
 THOMAS A. HIGGINS, District Judge.
 
 
 3
 This case involves an appeal by Ralph Hubert Barger from his jury conviction for conspiracy to violate federal explosives, firearms and arson laws and to convert a thing of value of the United States, in violation of 18 U.S.C. Sec. 371, and for knowingly converting a copy of the official law enforcement intelligence manual regarding the identities and personal data on members and associates of the Outlaws Motorcycle Club ("EPIC manual") knowing it to have been stolen, in violation of 18 U.S.C. Sec. 641, a misdemeanor. For the reasons that follow, we affirm the conviction.
 
 I. Background
 
 4
 We shall summarize only those facts and prior proceedings believed necessary to an understanding of the issues raised on appeal.
 
 
 5
 On August 12, 1986, members of the Outlaws Motorcycle Club shot and killed John Cleve Webb, a member of the Anchorage, Alaska chapter of the Hells Angels, in Louisville, Kentucky. Shortly thereafter, Mr. Barger, a member of the Oakland, California chapter of the Hells Angels, said that it was time to start killing Outlaws again. Edwin Hubert, president of the Anchorage, Alaska chapter also expressed retaliatory sentiment. The Outlaws and the Hells Angels have long been rivals. The Oakland chapter of the Hells Angels is considered the leading chapter of the club, and the appellant is the recognized leader of the Hells Angels.
 
 
 6
 Mr. Webb's funeral was held in Louisville, and a meeting of some Hells Angels members was held in a Louisville motel room to discuss information they had gathered on the killing. Mr. Barger did not attend the funeral, nor did he attend this meeting. After the meeting, the Hells Angels went to the bar where Mr. Webb was shot to "show a presence" and gather information. They talked to the owner of the bar and offered cash rewards for information.
 
 
 7
 Shortly thereafter, during a regular meeting of the Oakland Hells Angels chapter, the appellant admitted sending a copy of an "EPIC manual," a government document prepared by the United States El Paso Information Center and stamped "DEA Sensitive," to Mr. Webb's sister, and displayed another copy of the manual and explained how to use it. At this meeting, someone suggested calling the Outlaws to see whether the shooting was an isolated incident and Mr. Barger replied, "call them collect." The manual contained information regarding the Outlaws. Mr. Webb's sister received the manual via express mail from Mr. Barger and turned it over to members of the Hells Angels.
 
 
 8
 In September 1986, Mr. Hubert, the Anchorage chapter president, instructed Anthony Tait, an officer of the Anchorage chapter who also attended Mr. Webb's funeral, to get the EPIC manual from the appellant. Unknown to any Hells Angels members, Mr. Tait had begun acting as a paid FBI informant in 1984 to infiltrate the Hells Angels organization. Mr. Tait told Mr. Barger in a phone conversation that the FBI was investigating the package the appellant had sent to Louisville. Mr. Barger proposed the alibi that the package contained "sympathy cards." Mr. Tait then asked the appellant if he could borrow the EPIC manual. Mr. Barger lent Mr. Tait the manual for photocopying, telling him to be careful with it and that he was not supposed to have it.
 
 
 9
 On November 30, 1986, Mr. Barger and Michael O'Farrell (also convicted of conspiracy) attended a meeting of the Oakland chapter. At this meeting, the members circulated a photograph of the two Outlaws who killed Mr. Webb. On January 3, 1987, at a West coast officers' meeting, a photo of the two Outlaws who killed Mr. Webb was again circulated. At this time, Mr. Barger stated that Mr. Webb was killed because he was a Hells Angel.
 
 
 10
 On January 7, 1987, the appellant and Mr. Tait again discussed retaliation against the Outlaws, as they had on several earlier occasions. Mr. Tait encouraged Mr. Barger to travel to Alaska to provide guidance to that Hells Angels chapter about retaliation. During this time, Mr. Tait was flying all over the country at government expense to meet with various members of the Hells Angels.
 
 
 11
 On September 18, 1987, Kenny Yates, the president of the Cleveland chapter of the Hells Angels, was shot in Joliet, Illinois, allegedly by Outlaws. Shortly thereafter, Mr. Tait told the appellant that he had been to Chicago and Milwaukee, and that Mr. Tait would need an alibi if he was going to do something in retaliation. Mr. Barger said that "would be no problem."
 
 
 12
 On October 18, 1987, Mr. Tait told the appellant about a fictional plan he had to blow up the Outlaws' clubhouse in Chicago. They also discussed a potential alibi plan. Mr. Tait showed Mr. Barger some photos of the clubhouse, indicated where he would allegedly place the bombs and explained that the potential explosion would probably kill five or six people. The appellant replied: "That'll be really nice after that Joliet thing." Later in the conversation, Mr. Barger discussed his role in providing an alibi for Mr. Tait, including taking the hotel key and writing down the license plate number of Mr. Tait's rental car and other information. Mr. Barger also told Mr. Tait to call him one way or the other after the alleged bombing.
 
 
 13
 During October 20-23, 1987, Mr. O'Farrell stayed periodically in Mr. Tait's hotel room and drove Mr. Tait's rental car. On October 23, Mr. Tait called the hotel room and told Mr. O'Farrell to return the car, and that something had taken place. Mr. O'Farrell told Mr. Tait that he was "covered." When Mr. Tait said everything went well, Mr. O'Farrell expressed pleasure and said he would relay the message.
 
 
 14
 On November 9, 1987, Mr. Tait called the appellant and reported that the mission was accomplished. Mr. Barger responded, "All right." The next day, federal officers searched the appellant's residence, finding two EPIC manuals and a homemade bomb. At Mr. O'Farrell's residence federal officers found a Hyatt hotel room key and a handwritten note (evaluated at trial by a handwriting expert to be Mr. Barger's writing) listing Mr. Tait's hotel room number and rental car license plate number.
 
 
 15
 The appellant was one of twenty-one defendants originally indicted on December 15, 1987. The Superseding Indictment was returned on June 20, 1988. After a three-month trial, the jury found the appellant guilty of conspiracy and conversion (a misdemeanor) and Mr. O'Farrell guilty of conspiracy. The appellant was sentenced according to the federal sentencing guidelines and the Sentencing Reform Act of 1984. This appeal followed, raising numerous issues[1] that will be addressed separately.
 
 II. Outrageous Government Conduct
 
 16
 The first issue on appeal is whether the United States' investigative conduct was so outrageous as to deprive the appellant of his Fifth Amendment right to due process. Mr. Barger claims that the government's conduct so offended Fifth Amendment notions of fairness that his convictions should be reversed. The government insists that its conduct was not outrageous, but was commensurate with the risk of retaliation presented by the Hells Angels. The district court did not find that the government's conduct was so outrageous as to deny the appellant his right to due process.
 
 
 17
 Fundamental fairness is a core component of the Due Process Clause of the Fifth Amendment. United States v. Brown, 635 F.2d 1207, 1212 (6th Cir.1980). A plurality of the United States Supreme Court in Hampton v. United States, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976), indicated that some police conduct might be so egregious as to violate the accused's due process rights. In fact, Justice Powell noted that "[p]olice overinvolvement in crime would have to reach a demonstrable level of outrageousness before it could bar conviction." Id., 425 U.S. at 495, n. 7, 96 S.Ct. at 1653, n. 7, 48 L.Ed.2d at 122, n. 7.
 
 
 18
 This court has said that the challenged government conduct must violate fundamental fairness and be "shocking to the universal sense of justice." Brown, 635 F.2d at 1212 (quoting United States v. Russell, 411 U.S. 423, 432, 93 S.Ct. 1637, 1643, 36 L.Ed.2d 366, 373 (1973)). As such, this circuit has been reluctant to grant the sanctions that the appellant seeks, since "to do so would greatly intrude into the law enforcement functions of the executive branches of federal and state governments." United States v. Norton, 700 F.2d 1072, 1075 (6th Cir.), cert. denied, 461 U.S. 910 (1983); see also United States v. Bowling, 666 F.2d 1052 (6th Cir.1981), cert. denied, 455 U.S. 960 (1982); United States v. Leja, 563 F.2d 244 (6th Cir.1977), cert. denied, 434 U.S. 1074 (1978).
 
 
 19
 The Sixth Circuit has articulated four factors for determining if governmental conduct is outrageous: (1) the need for the police conduct as shown by the type of criminal activity involved, (2) the impetus for the scheme or whether the criminal enterprise preexisted the police involvement, (3) the control the government exerted over the criminal enterprise, and (4) the impact of the police activity on the commission of the crime. United States v. Robinson, 763 F.2d 778, 785 (6th Cir.1985); Norton, 700 F.2d at 1075; Brown, 635 F.2d at 1212-13. Since these are factors for consideration, not mandatory prongs in a test, every one need not be shown.
 
 
 20
 Consideration of the need for the police conduct through its undercover informant must be viewed in light of the type of criminal activity involved. Mr. Barger argues that the government's outrageous conduct included: the government hiring Mr. Tait on a contingent fee basis; Mr. Tait traveling from city to city throughout the country, spending $150,000 of government money to recruit Hells Angels to retaliate against the Outlaws; inciting Hells Angels to retaliate; and specifically inciting Mr. Barger to retaliate.
 
 
 21
 The government contends that its conduct was necessary, given the violent histories of both the Hells Angels and the appellant. It argues that retaliation had to be expected when the Outlaws, a long-time rival of the Hells Angels, killed Mr. Webb. Further, the Hells Angels' conduct after Mr. Webb's death confirmed the need for an undercover investigation. The court agrees with the government's position.
 
 
 22
 In Norton, this court declined to find outrageous government conduct when a federal agent infiltrated the Ku Klux Klan and actively participated in the planning and execution of a bombing operation, because of the Klan's violent history and the secretive nature of the organization. Norton, 700 F.2d at 1075. In the instant action, it was imperative that the government's informant act like a Hells Angel. Had Mr. Tait shown total disdain for the retaliation, the Hells Angels would not have included him in their plans and the FBI would not have been able to prevent retaliation against the Outlaws.
 
 
 23
 The second factor has been articulated two ways by this court, but the meaning is identical. In Norton, we stated it as whether the criminal enterprise preexisted the police involvement. In that case we held that police activity did not offend fundamental fairness where "the agent did not instigate the scheme; rather, he joined a group that had already begun planning the criminal activity." Norton, 700 F.2d at 1075. In Robinson, we stated it as whether the government provided the impetus for the criminal scheme. Robinson, 763 F.2d at 785.
 
 
 24
 The appellant argues that the government, via Mr. Tait's conduct, gave the impetus for the scheme. He contends that the retaliation scenario against the Chicago Outlaws chapter was solely concocted by the FBI and kept alive by Mr. Tait inflaming the Hells Angels to act.
 
 
 25
 The government, on the other hand, argues that the Hells Angels reacted to Mr. Webb's death immediately, without government prompting. There was a meeting of Hells Angels in a Louisville motel room shortly after Mr. Webb's death; members began to offer cash rewards for information regarding Mr. Webb's death; and the appellant shipped a copy of an EPIC manual to Louisville. The court rejects the appellant's argument and finds that the impetus for the scheme was provided by members of the Hells Angels.
 
 
 26
 The third and fourth factors are interrelated, given the facts of this case. The appellant asserts that the government, through Mr. Tait, exercised extensive control over the situation and created the retaliation scheme for which the appellant was convicted. The government contends that the control exerted by it was positive control, preventing retaliation. Further, the government asserts that Mr. Barger, as the national leader of the Hells Angels, had ultimate control over the enterprise.
 
 
 27
 The government did to an extent control the scheme. However, this court has held that "the mere supplying of a crucial ingredient or means to commit a crime by itself does not violate due process." Robinson, 763 F.2d at 785. Further, we have stated that "the Supreme Court has repeatedly emphasized that the police may use artifice and stratagem." Id. Therefore, the fact that the appellant did not create the plan to provide Mr. Tait with an alibi is insignificant. This is supported by the fact that Mr. Barger expressed pleasure at hearing Mr. Tait's plan and adopted it as his own.
 
 
 28
 The appellant argues a fifth factor perceived from his reading of Robinson. This court in its opinions in Robinson, and prior and subsequent cases, has articulated only four factors in determining whether the government acted so outrageously as to deny the accused of his Fifth Amendment right to due process.[2]
 
 
 29
 We find that the government in this action did not act outrageously, but, rather, responded to the real threat of retaliation, which could have caused great personal harm and property damage, between two rival gangs with a history of violence.
 
 III. Challenge to the Sentencing Guidelines
 
 30
 Next, the appellant argues that the district court erred when it sentenced him pursuant to the Sentencing Reform Act and guidelines. On appeal, Mr. Barger contends that (1) all the alleged offenses were committed prior to November 1, 1987, (2) even if an alleged offense occurred after that day, the pre-Sentencing Reform Act rules are applicable to offenses that "straddle" the effective date of the Act (begin before and end after November 1, 1987), and (3) if the Act is applicable, then it violates the ex post facto clause of the Constitution.
 
 
 31
 The appellant was sentenced pursuant to the sentencing guidelines for the conspiracy count only. That count constitutes one offense that cannot be divided into different parts. The government contends that the conspiracy continued until the United States ended it by arresting and charging the conspirators on November 10, 1987. "A jury's verdict represents a finding that a crime was committed as alleged in the indictment...." United States v. Henson, 848 F.2d 1374, 1385 (6th Cir.1988), cert. denied, 488 U.S. 1005 (1989). Thus, when the appellant was convicted of the conspiracy alleged in Count One, the jury found that the crime took place up to and including the date alleged in the indictment, which is from on or about August 12, 1986, up to the date of the indictment--December 15, 1987.[3]
 
 
 32
 Two events in this case took place after the November 1, 1987, effective date of the sentencing guidelines. First, on November 9, 1987, Mr. Tait called the appellant as he had been asked to confirm that the mission had been accomplished. Second, federal agents searching the appellant's residence on November 10, 1987, found a homemade bomb and a copy of the EPIC manual. See Henson, 848 F.2d at 1386 (evidence found at defendant's business during execution of search warrant supports existence of conspiracy to that date). The district court found that these two factors were part of and in furtherance of the conspiracy. Since the appellant alleges no affirmative withdrawal prior to his arrest date of November 10, 1987, his contention that the conspiracy ended before November 1, 1987, is not persuasive. See United States v. Edgecomb, 910 F.2d 1309, 1311 (6th Cir.1990); and United States v. Walton, 908 F.2d 1289, 1300 (6th Cir.), cert. denied, 111 S.Ct. 273 (1990) (guidelines applied where there was no evidence of affirmative withdrawal from the conspiracies prior to November 1, 1987).
 
 
 33
 The appellant's second contention is that the pre-Sentencing Reform Act rules are applicable to offenses that "straddle" the Act's effective date. This court recently has ruled precisely on this issue and held the converse to be true. In United States v. Edgecomb, 910 F.2d 1309, 1311-12 (6th Cir.1990), two defendants pled guilty to conspiracy to possess cocaine with intent to distribute. The period of the conspiracy ran from January 1987 to on or about December 11, 1987, thus "straddling" the November 1, 1987, effective date of the sentencing guidelines. This court held that, because conspiracy "is a continuing crime which is not completed at the conclusion of the agreement," the sentencing guidelines were applicable.
 
 
 34
 In United States v. Walton, 908 F.2d 1289, 1299-1300 (6th Cir.1990), the defendants were convicted of conspiracy to distribute cocaine. The indictment alleged that the period of the conspiracy ran from 1980 through the time of the indictment in 1988, thus straddling the effective date of the sentencing guidelines. This court held that, because the defendants committed continuing offenses, application of the sentencing guidelines was warranted.
 
 
 35
 This court in Walton also addressed the appellant's third contention that applying the guidelines violates the ex post facto clause of the Constitution. In Walton, we stated: "We agree with the overwhelming weight of authority holding that a defendant who commits a continuing offense beginning before the effective date of the guidelines and ending after the effective date of the guidelines can be sentenced under the guidelines without violating the ex post facto clause of the Constitution." Id. at 1299.
 
 
 36
 Further, when a crime still is being carried on and continued after the effective date of a statute imposing a greater penalty for conspiracy, no violation of the ex post facto clause occurs when the court applies that statute to the conspiracy. Henson, 848 F.2d at 1386.
 
 
 37
 Because of the foregoing analysis, we reject the appellant's three-pronged challenge of the district court's application of the sentencing guidelines. Therefore, it was not error for the district court to sentence the appellant under the federal guidelines.
 
 IV. Entrapment
 
 38
 The appellant maintains that he was not predisposed to engage in criminal conduct before being entrapped by Mr. Tait, who provided the following inducements: approaching Mr. Barger with a fictional plan to blow up the Chicago Outlaws' clubhouse; providing an alibi for the plan; urging Mr. Barger to talk with the Alaska Hells Angels for guidance in a retaliation; and telling Mr. Barger that he, Mr. Tait, was doing all the leg work in order to encourage Mr. Barger to act. The government argues that the appellant had both the predisposition and intent to participate in the conspiracy to retaliate against the Outlaws before Mr. Tait proposed the fictional Chicago bombing.
 
 
 39
 The Supreme Court in Mathews v. United States, 485 U.S. 58, 108 S.Ct. 883, 99 L.Ed.2d 54 (1988), noted the two related elements to a valid entrapment defense: "government inducement of the crime and a lack of predisposition on the part of the defendant to engage in the criminal conduct." Id., 485 U.S. at 63, 108 S.Ct. at 886, 99 L.Ed.2d at 61 (citing Sorrells v. United States, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932)). Further, predisposition "focuses upon whether the defendant was an 'unwary innocent' or instead, an 'unwary criminal' who readily availed himself of the opportunity to perpetrate the crime." Id. (citing Sherman v. United States, 356 U.S. 369, 372, 78 S.Ct. 819, 820, 2 L.Ed.2d 848, 851 (1958); United States v. Russell, 411 U.S. 423, 436, 93 S.Ct. 1637, 1645, 36 L.Ed.2d 366, 376 (1973)).
 
 
 40
 The appellant claims that the district court erred in declining to find entrapment as a matter of law. However, this court has stated:
 
 
 41
 [I]n order for a claim of entrapment as a matter of law to succeed, the testimony and facts must be undisputed; a court may not choose between conflicting testimony or make credibility determinations. Furthermore, the undisputed evidence must demonstrate a 'patently clear' absence of predisposition. If either of these elements is missing, then the predisposition question is for the jury to decide.
 
 
 42
 United States v. Pennell, 737 F.2d 521, 534 (6th Cir.1984) (citations omitted) (emphasis in original), cert. denied, 469 U.S. 1158 (1985); see also United States v. Hodge, 539 F.2d 898, 906 (6th Cir.1976), cert. denied, 429 U.S. 1091 (1977). Further, we have held that "[i]n determining whether the evidence was, as a matter of law, insufficient to establish predisposition, we must view that evidence in the light most favorable to the prosecution and resolve all reasonable inferences therefrom in its favor." United States v. McLernon, 746 F.2d 1098, 1111 (6th Cir.1984) (emphasis added).
 
 
 43
 The standard articulated in Pennell is considered a difficult one to meet, and the Supreme Court has recognized that "[t]he question of entrapment is generally one for the jury, rather than for the court." Mathews, 485 U.S. at 63, 108 S.Ct. at 886, 99 L.Ed.2d at 61. Viewing the evidence in the light most favorable to the government in this situation, we hold that Mr. Barger failed to produce undisputed evidence demonstrating a patently clear absence of predisposition. Therefore, the district court did not err in presenting the entrapment defense to the jury.
 
 
 44
 The Sixth Circuit has stated that, once in issue, the defendant's predisposition must be proven beyond a reasonable doubt by the government. United States v. Johnson, 855 F.2d 299, 303 (6th Cir.1988). We have defined predisposition as "the defendant's state of mind before his initial exposure to government agents." McLernon, 746 F.2d at 1112 (quoting United States v. Kaminski, 703 F.2d 1004, 1008 (7th Cir.1983)). Factors relevant in determining whether a defendant is predisposed to commit a crime are:
 
 
 45
 the character or reputation of the defendant, including any prior criminal record;
 
 
 46
 whether the suggestion of the criminal activity was initially made by the Government;
 
 
 47
 whether the defendant was engaged in the criminal activity for profit;
 
 
 48
 whether the defendant evidenced reluctance to commit the offense, overcome only by repeated Government inducement or persuasion; and
 
 
 49
 the nature of the inducement or persuasion supplied by the Government.
 
 
 50
 Johnson, 855 F.2d at 303; McLernon, 746 F.2d at 1112; Kaminiski, 703 F.2d at 1008.
 
 
 51
 First, Mr. Barger is the recognized leader of the Hells Angels, an organization with a history of violence. However, the appellant has had no criminal convictions since the early 1970s. Second, the evidence shows that Mr. Barger discussed retaliation many times with various members of the Hells Angels. Further, he took action: he acquired a copy of the EPIC manual, with information on the Outlaws; he sent the EPIC manual to Kentucky, where Hells Angels members received it; and he gave a copy of the EPIC manual to Mr. Tait. Mr. Barger's involvement began immediately upon Mr. Webb's death. This was long before Mr. Tait talked to him about the fictional bombing and alibi scenario. Third, Mr. Barger was not engaged in the criminal activity for profit, but for retaliation against the Outlaws. Fourth, Mr. Barger evidenced no reluctance to become involved in the conspiracy. When Mr. Tait told Mr. Barger about the plan to blow up the Outlaws' clubhouse, he expressed interest and pleasure in its retaliatory nature.[4] Later, the appellant stated that it would be "no problem" to devise an alibi. Mr. Barger also participated in the execution of the alibi by taking the hotel key and asking for, and writing down, the license plate number of the rental car. Mr. Barger joined in the alibi plan with no repeated inducement or persuasion by the government. Fifth, the nature of the government's inducement was concocting the scenario to blow up the Outlaws' clubhouse. However, it has been held that the fact a government agent proposed an illicit transaction or attempted to arrange the purchase of narcotics is insufficient to establish entrapment. See United States v. Andrews, 765 F.2d 1491, 1499 (11th Cir.1985), cert. denied, 474 U.S. 1064 (1986); United States v. Henciar, 568 F.2d 489, 491 (6th Cir.1977), cert. denied, 435 U.S. 953 (1978); United States v. Hairrell, 521 F.2d 1264, 1267 (6th Cir.), cert. denied, 423 U.S. 1035 (1975).
 
 
 52
 Therefore, it is clear from the plethora of evidence that the jury could have rationally concluded beyond a reasonable doubt that Mr. Barger was predisposed to committing the offense. The government offered strong proof of the appellant's predisposition before his initial exposure to Mr. Tait's fictional bombing and alibi scenario. Accordingly, we reject the appellant's argument that his conviction for conspiracy should be reversed because of government entrapment.
 
 V. Insufficient Evidence for Conversion
 
 53
 The appellant claims that his conviction for conversion, i.e., obtaining and sending the EPIC manual to Kentucky, should be reversed because the United States failed to prove the following essential elements of the offense: (1) that the EPIC manual had value, (2) that the manual was property "of the United States" and (3) that he possessed the EPIC manual without authority.
 
 
 54
 The jury convicted the appellant of Count Two of the Superseding Indictment, which charged Mr. Barger and others who had "knowingly converted to their own use and the use of another, and without authority conveyed and disposed of, and knowingly received, concealed and retained" the EPIC manual, which is a thing of value to the United States, knowing it to have been stolen. This was pursuant to 18 U.S.C. Sec. 641 (1943), which provides in pertinent part:
 
 
 55
 Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys or disposes of any record, voucher, money, or thing of value of the United States or of any department or agency thereof, or any property made or being made under contract for the United States or any department or agency thereof; or
 
 
 56
 Whoever receives, conceals, or retains the same with intent to convert it to his use or gain, knowing it to have been embezzled, stolen, purloined or converted [shall be punished as provided herein].
 
 
 57
 First, Mr. Barger contends that the government failed to prove the value of the copy of the EPIC manual. However, the testimony at trial showed that the manual was a very important investigative resource because it contained detailed information on the Outlaws. A witness from the El Paso Information Center stated that the manual was valuable because it took hundreds of hours and approximately $21,000 to produce the original. Further, he testified that each copy costs more than $20.
 
 
 58
 Clearly, the value of the EPIC manual is in the information contained therein. This court has held that information itself is enough to meet the property or "thing of value" element of the statute. United States v. Jeter, 775 F.2d 670, 680-82 (6th Cir.1985), cert. denied, 475 U.S. 1142 (1986); see also United States v. Girard, 601 F.2d 69, 70-71 (2d Cir.) (information in DEA computer records was a "thing of value" sold in violation of Sec. 641), cert. denied, 444 U.S. 871 (1979); United States v. Friedman, 445 F.2d 1076, 1087 (9th Cir.) (information in transcripts as to grand jury proceedings held to be a "thing of value"), cert. denied, 404 U.S. 958 (1971). This is so whether the information is contained in the original or in a copy. Also, there is no evidence in the record that the EPIC manual was outdated and, thus, had lost its value, as the appellant claims.
 
 
 59
 Second, Mr. Barger contends that the government failed to prove that the manual was the property "of the United States" because it could have been one of the manuals that was made available to state and local police departments. However, just because the manual may have been in the possession of state or local law enforcement, and there is no proof that it was, does not mean that it lost its character as federal property. See Hayle v. United States, 815 F.2d 879, 882 (2d Cir.1987) (federal grant money remains government property in accordance with Sec. 641 even after being deposited in personal bank account); United States v. Largo, 775 F.2d 1099, 1101 n. 3 (10th Cir.1985) (federal grant money does not lose its federal character simply because it is administered by a nonfederal agency), cert. denied, 474 U.S. 1105 (1986).
 
 
 60
 Mr. Barger also argues that the manual lost its federal character because the government failed to demonstrate proper "supervision and control" over it. Again, however, just because the particular manual in question may have been obtained from a local law enforcement agency or from someone who illicitly made copies of it and gave it to his friends, as the appellant suggests, does not mean that the manual did not belong to the United States.
 
 
 61
 There is ample evidence that the United States does exercise supervision and control over the EPIC manuals. The Drug Enforcement Agency controls the distribution of the manuals as follows: manuals are not released to non-law enforcement personnel, manuals are released to only those law enforcement officers with a specific need for the information and the El Paso Information Center keeps records of those to whom it sends copies. Further, every page of the EPIC manual is marked "DEA Sensitive," and the inside front cover contains a warning that unauthorized disclosure is prohibited.[5] Therefore, it is clear that the EPIC manual was property of the United States and that Mr. Barger was not a person authorized to possess it.
 
 
 62
 Third, Mr. Barger contends that the government failed to produce evidence showing him as being "without authority" to convey the manual. It is apparent to the court that Mr. Barger lacked authority to transfer the EPIC manual, and he even admitted to Mr. Tait that he was not supposed to have it. The manuals are restricted. They are distributed only to law enforcement agencies and to people within those agencies with a special need to know the information contained in the manuals. Mr. Barger fits none of those qualifications. Further, the preface to the manual clearly states that only certain people with certain needs are authorized to possess it. The manual is not available to the public. Since Mr. Barger possessed the manual, he was on notice that neither he nor the person to whom he transferred it was entitled to have it.
 
 
 63
 It is unnecessary under Sec. 641 to prove that the EPIC manual was stolen, although this was alleged in the Superseding Indictment, because the statute will be satisfied by proving unauthorized sale or conversion. Girard, 601 F.2d at 71 (citing United States v. Sher, 418 F.2d 914, 915 (9th Cir.1969)).
 
 
 64
 The standard of review for challenges to the sufficiency of evidence is whether "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Martin, 897 F.2d 1368, 1373 (6th Cir.1990) (citing Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979)).
 
 
 65
 Based upon the foregoing, we reject Mr. Barger's contention that there was insufficient evidence to support his conviction of unauthorized conversion of the EPIC manual.
 
 VI. Insufficient Evidence for Conspiracy
 
 66
 The appellant contends that the United States produced insufficient evidence to support his conspiracy conviction. Mr. Barger and Mr. O'Farrell were convicted of conspiracy to blow up the Outlaws' clubhouse in Chicago. The appellant argues that the government did not show an agreement between himself and Mr. O'Farrell that could form the basis of a conspiracy charge.
 
 
 67
 However, we have held that proof of a formal agreement is not necessary to establish an unlawful conspiracy; indeed, a conspiracy "may be inferred from acts done with a common purpose."[6] United States v. Ayotte, 741 F.2d 865, 867 (6th Cir.), cert. denied, 469 U.S. 1076 (1984) (citing United States v. Luxenberg, 374 F.2d 241, 250 (6th Cir.1967)); see also American Tobacco Co. v. United States, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946). Further, "[i]t is only necessary that a defendant know of the conspiracy, associate himself with it, and knowingly contribute his efforts in its furtherance." Luxenberg, 374 F.2d at 250.
 
 
 68
 The appellant correctly states that a conspiracy cannot be proven by an agreement between a defendant and a government agent or informer. Pennell, 737 F.2d at 536.
 
 
 69
 We hold that the evidence, when viewed in the light most favorable to the government, was substantial enough to support the appellant's conviction by the jury. Mr. Barger talked to many Hells Angels, both at formal meetings and elsewhere, about retaliation against the Outlaws; he circulated photos of the Outlaws believed to have killed Mr. Webb; and he circulated the EPIC manual. Further, Mr. Barger joined in the conspiracy to blow up the clubhouse without the government's repeated encouragement, and he expressed pleasure at the possibility that five or six Outlaws might be killed by the bomb. Then, Mr. Barger took an active role in providing Mr. Tait with an alibi while he was supposed to be in Chicago.
 
 
 70
 Again, we review insufficiency of evidence claims in a light most favorable to the government. See Martin, supra. Based upon that standard, we hold that a reasonable jury could have found the evidence sufficient to support the conclusion that Mr. Barger conspired to blow up the Outlaws' clubhouse.
 
 VII. Cumulative Error
 
 71
 The appellant's final contention is that his due process rights were violated by cumulative error throughout the trial. He cites two rulings by the district judge for the basis of this argument.
 
 
 72
 The first error is the use of polygraph results by the government during trial to bolster the testimony of its informant, Mr. Tait. The appellant argues that, as a key prosecution witness, Mr. Tait's credibility was crucial to the case. The appellant insists that this is particularly so, since his account of the early stages of the conspiracy was not corroborated by tape recordings. The government disputes this, citing several portions of the trial record in which Mr. Tait's testimony as to the early stages of the conspiracy was supported by other evidence.
 
 
 73
 The use of a polygraph test initially came up at trial when an FBI agent was describing the FBI's contract with Mr. Tait. Mr. Barger's counsel objected, citing the parole evidence rule and stating that the document speaks for itself. In response, the court instructed the agent to read the contract into evidence. One part of the contract required Mr. Tait to submit to periodic polygraph tests. There were no objections at this point. There was also no objection when Special Agent Marischen stated, without elaboration, that he set up polygraph tests for Mr. Tait. Further, counsel for the defendants initiated discussion about the polygraph results while cross-examining Mr. Tait.
 
 
 74
 The appellant contends that any introduction of polygraph material was error, citing United States v. Murray, 784 F.2d 188 (6th Cir.1986). In Murray, an experienced FBI agent deliberately introduced polygraph material at trial. However, a distinguishing factor is that, in Murray, it was the defendant, not an FBI informant, who had been asked to take a polygraph test. The trial judge charged the jury to disregard it, but the Sixth Circuit found prejudicial error.
 
 
 75
 Generally, the results of polygraph examinations are inadmissible into evidence. Wolfel v. Holbrook, 823 F.2d 970, 972 (6th Cir.1987), cert. denied, 484 U.S. 1069 (1988); Barnier v. Szentmiklosi, 810 F.2d 594, 597 (6th Cir.1987). However, in Murray, this court stated: "We do not hold that under any and all circumstances in every case where the words 'polygraph examination', are mentioned, a grant of a new trial would be required." Murray, 784 F.2d at 189 (emphasis in original). In fact, this court has on several occasions refused to impose a per se prohibition against polygraph evidence. See Wolfel, supra; Murphy v. Cincinnati Ins. Co., 772 F.2d 273, 277 (6th Cir.1985); United States v. Betancourt, 838 F.2d 168 (6th Cir.), cert. denied, 486 U.S. 1013 (1988).
 
 
 76
 This circuit has developed a two-step analysis when considering the admissibility of polygraph evidence. First, the evidence must be relevant; second, its probative value must outweigh the risk of unfair prejudice. Wolfel, 823 F.2d at 972; Murphy, 772 F.2d at 277.
 
 
 77
 First, we hold that the evidence is relevant since the appellant had questioned Mr. Tait's credibility, thus putting it at issue. Further, Mr. Tait's submission to polygraph tests was part of his contract with the FBI, which the defense put in issue several times during the trial. Second, we note that the government witnesses did not explore the issue, but that it twice came up that Mr. Tait would submit to polygraph tests. Then the defense cross-examined Mr. Tait on the issue. Given these facts, we hold that the district court did not abuse its discretion in determining that the probative value of the evidence outweighed the risk of prejudicial effect.
 
 
 78
 The second trial error the appellant asserts is that his right to a fair trial was violated when one morning before trial a juror saw co-defendant O'Farrell in shackles. Mr. Barger argues that, since he and Mr. O'Farrell were closely associated in view of the evidence at trial, viewing Mr. O'Farrell in custody would prejudice a juror against him.
 
 
 79
 The juror notified the court several days after seeing the co-defendant in custody. The trial judge asked the juror whether he could completely disregard what he saw and the juror responded that it did not effect him at all. All defense counsel were present during the questioning, and the judge consulted with them so he could ask any questions they had. Further, the judge instructed the juror that Mr. O'Farrell was not presently in custody. (Mr. O'Farrell was released on bond between the time when the juror saw him and the court was notified).
 
 
 80
 It is true that "one accused of a crime is entitled to have his guilt or innocence determined solely on the basis of the evidence introduced at trial" and not on other circumstances not adduced at trial. Holbrook v. Flynn, 475 U.S. 560, 567, 106 S.Ct. 1340, 1345, 89 L.Ed.2d 525, 533 (1986) (quoting Taylor v. Kentucky, 436 U.S. 478, 98 S.Ct. 1930, 56 L.Ed.2d 468 (1978)). The Court in Holbrook also articulated a two-part test for evaluating prejudice during a court proceeding. The defendant must demonstrate either that the alleged misconduct was inherently prejudicial or that it caused actual prejudice. Id., 475 U.S. at 572, 106 S.Ct. at 1347-48, 89 L.Ed.2d at 537.
 
 
 81
 This court has held that, generally, the degree of security relating to a defendant is within the judge's discretion. United States v. Christian, 786 F.2d 203, 215 (6th Cir.1986) (citing Payne v. Smith, 667 F.2d 541, 544 (6th Cir.1981)).[7] In United States v. Crane, 499 F.2d 1385 (6th Cir.), cert. denied, 419 U.S. 1002 (1974), a case very similar on the facts with the case at hand, three jurors saw the co-defendants being led to the courtroom while handcuffed to each other. The trial judge questioned the jurors, who answered that it did not affect their votes in the case. We held that the defendant was not prejudiced by the brief encounter with the jurors. Id. at 1389. Further, in Crane, we distinguished the inherent prejudice to a defendant who is manacled or shackled while in the courtroom with a defendant in shackles who has been seen for a brief period somewhere in the courthouse.[8] Id.
 
 
 82
 Similarly, in United States v. Chipman, 513 F.2d 1262, 1263 (6th Cir.1975), this court held that, given the remedial measures taken by the trial judge, the jurors' brief view of the defendant in handcuffs at the end of a trial day did not deprive the defendant of a fair trial.
 
 
 83
 It is not inherently prejudicial to bring a defendant to the courthouse or courtroom in custody as a security measure. Further, Mr. Barger has failed to show actual prejudice or that he was denied a fair trial and, thus, that his constitutional rights were violated. The trial judge in this instance questioned the juror in front of defense counsel, who did not object to the judge's handling of the matter. We reject the appellant's contention that he was prejudiced by this situation.
 
 
 84
 A motion for mistrial based on cumulative error was made at the end of the trial. Although this motion was not made by Mr. Barger's counsel, the district court had ruled that all defendants adopted one another's objections.
 
 
 85
 These two rulings were within the trial judge's discretion, and we hold that these two alleged errors do not rise to the level of cumulative error that could have produced a fundamentally unfair trial resulting in the defendant being deprived of his constitutional right to due process.
 
 VIII. Conclusion
 
 86
 Accordingly, for the foregoing reasons, the judgment of the district court is AFFIRMED.
 
 
 
 *
 The Honorable Thomas A. Higgins, United States District Judge for the Middle District of Tennessee, sitting by designation
 
 
 [1]
 At oral argument the appellant waived the third issue in his brief concerning whether the evidence offered at trial varied from the terms of the indictment, thus prejudicing his defense
 
 
 [2]
 See United States v. Norton, 700 F.2d 1072, 1075 (6th Cir.) cert. denied, 461 U.S. 910 (1983); United States v. Johnson, 855 F.2d 299, 305 (6th Cir.1988); United States v. Edgecomb, 910 F.2d 1309, 1312 (6th Cir.1990)
 
 
 [3]
 The events alleged in the Superseding Indictment (returned June 20, 1988) occurring between November 10, 1987 to March 23, 1988, involve activities of the defendants while incarcerated
 
 
 [4]
 When Mr. Tait explained to Mr. Barger that probably five to six people would be killed by the bombing, Mr. Barger replied, "That'll be really nice after that Joliet thing," referring to the shooting death of Kenny Yates, a Hells Angel
 
 
 [5]
 Wade A. Gardner of the El Paso Information Center at trial read the preface on the inside front cover of the EPIC manual:
 This material is marked D.E.A. sensitive. Material marked D.E.A. sensitive is information that does not qualify for classification as national security information. It nevertheless requires special protection against unauthorized or inadvertent disclosure to protect sources and the methods of investigative activity, evidence and the integrity of pretrial case reports. D.E.A. sensitive material may be disseminated only to those persons in your agency having a bonafide need to know. Further ... D.E.A. sensitive material must be stored in locked container and destroyed by shredding or burning.
 
 
 [6]
 The Sixth Circuit has also stated that a tacit or mutual understanding between the parties is enough to prove a conspiratorial agreement. United States v. Bavers, 787 F.2d 1022, 1026 (6th Cir.1985) (citing United States v. Toney, 527 F.2d 716 (6th Cir.1975), cert. denied, 429 U.S. 838 (1976))
 Further, "A conspiracy may be inferred from circumstantial evidence that can reasonably be interpreted as participation in the common plan." Id. (citing United States v. Strong, 702 F.2d 97 (6th Cir.1983)).
 
 
 [7]
 In United States v. Diecidue, 603 F.2d 535 (5th Cir.1979), cert. denied, 445 U.S. 946 (1980), a juror saw the defendants entering the courthouse in handcuffs. The Fifth Circuit stated that: "The conditions under which defendants were seen were routine security measures rather than situations of unusual restraint such as shackling of defendants during trial." Id. at 549
 
 
 [8]
 The appellant cites Illinois v. Allen, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970), in support of his position. However, in Allen, the issue was not custody of the defendant, who apparently was not shackled, but his conduct in the courtroom