NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 19a0339n.06

Case No. 18-5863

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Jul 05, 2019
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE WESTERN DISTRICT OF |
| DONALD MARTIN, | ) | KENTUCKY |
| | ) | |
| Defendant-Appellant. | ) | |

_____/

Before: GUY, THAPAR, and NALBANDIAN, Circuit Judges.

**RALPH B. GUY, JR., Circuit Judge.** A jury convicted defendant Donald Martin of attempting to persuade a minor to engage in sexual activity and of traveling in interstate commerce to engage in illicit sexual conduct with a minor. He appeals from the court's judgment, raising three arguments. First, he asserts that no reasonable jury could have rejected his entrapment defense. Second, he claims that the district court's response to a jury question amounted to a directed verdict. And third, he contends that prior to trial, his rights under the Speedy Trial Act were violated, thus requiring a dismissal of the indictment. We reject all three arguments and affirm.

I.

Entrapment is an affirmative defense developed by the Supreme Court and premised on the "notion that Congress could not have intended criminal punishment for a defendant who has committed all the elements of a proscribed offense but was induced to commit them by the Government." *United States v. Russell*, 411 U.S. 423, 435 (1973). If "there is sufficient evidence from which a reasonable jury could find entrapment," a defendant is "entitled to an entrapment instruction." *Mathews v. United States*, 485 U.S. 58, 62 (1988). Entrapment has two elements: (1) government inducement of the crime, and (2) defendant's lack of predisposition to engage in the criminal conduct. *Id.* at 62–63. When a defendant raises the defense, the government bears the burden of proving, beyond a reasonable doubt, that the defendant was "disposed to commit the criminal act prior to first being approached by Government agents." *Jacobson v. United States*, 503 U.S. 540, 549 (1992).

Martin requested and received a jury instruction on entrapment. The jury still found him guilty. He now insists that "a jury finding predisposition could only be the product of sheer speculation, total guess or a baseless hunch." He thus argues that there was insufficient evidence to convict him. We therefore turn to the evidence itself, which consisted of emails, text messages, Martin's own statements, and the testimony of a Kentucky detective.

A.

On a Tuesday morning in August 2017, Donald Martin placed an ad in the "Casual Encounters" section of Craigslist.org. Martin lives in Indiana but his ad was targeted at the Louisville, Kentucky area. He titled it "Looking for my little kitten." This is what the ad said:

> Hello. I'm a mature man looking for a young girl to be my little kitten. Submissive would be nice, daughter/daddy role play a definite plus. I am white, well educated, easy going yet dominate. YOU HOST, except when I can. I am std free and vasectomy safe. I will not reply to a different email address, so don't bother. Pics

and a local phone number within 2 to 3 emails. Put 'Kitten' in the subject line to weed out spam. Looking forward to hearing from you.

The ad also included a brief description of Martin's own height and body type.

As it happened, Detective Matt Hedden went to the same website that week too, but with a different purpose. Hedden is part of the Kentucky Attorney General's "Internet Crimes Against Children Task Force" and part of his job is to search websites for keywords "associated with illegal acts or acts that involve children for sexual purposes." When he ran a search for "young girl", Martin's ad showed up. Hedden clicked the reply button on the ad and their correspondence began.

Hedden sent Martin the first email just after midnight on the Friday morning after Martin placed the ad. By the end of the day, the two had exchanged nearly 50 emails. But the topic of age came up immediately. Hedden's first message read, "Hey ru still looking for a younger girl?"[1] Martin wrote back a few hours later. "Yes I am. Tell me a little about yourself amd lets talk." Hedden responded, "15 w/f just moved here like a month ago w my mom. Dated older before but not looking for serious or anything." Minutes later, Martin replied, "What are you doing on CL...your suspose to be ar least 18[.]" Hedden emailed back, "lol wuteva bye" followed by a waving-hand emoji. Martin soon responded, "Well I may be old, but I am not stupid," and then wrote in a follow-up email, "You are one of 3 things...and they all spell Trouble." The two then shot short messages back and forth in which Martin asked whether Hedden was "a police officer or in any way associated with law enforcement or any agency dealing with minors?" Hedden, speaking in his persona, denied being a "cop or anything."

Martin sought more information. Where did "Jenna" (Hedden's persona) live? How old was her previous boyfriend, and had she had sex with him? Would she send him a picture? Martin

---

[1] We quote the correspondences verbatim. Spelling, punctuation, and abbreviations are original.

told Hedden he wanted to keep emailing, but couched, "Cant say anything more will happen..but then again I cant say it wont...you are a sweet pretty young lady and I am certainly intrigued..."

The email exchange continued into Monday, by which time Martin made his intentions plain. "Jenna" told Martin that she was bored at school that day. "I wish I could make you unboard..." wrote Martin. "[H]ow ru gonna do that[?]" Hedden asked, before instructing Martin to "just tell me what u want[.]" "Well I would live to get in your pants...that plain enough?" Martin wrote back. He went on to assure "Jenna" why she would not become pregnant and suggested sexual activities they might engage in. Martin confessed, "I have not had anyone in my life for a long time. So even in spite of your age I am willing to risk it." "y ru risking?" Hedden pressed, "ru married or any thing?" "Its risky because your under age," Martin replied.

The two then began making plans to meet. Martin brought it up. "I definately want a young woman to see when we can, so its strictly up to you. I am lonely for the affection of a nice girl. And am hoping that is you," he wrote. "[W]hat u want to do then[?]" inquired Hedden. "Well first I want to meet you in person. Get acquainted better and see how we are with each other. After that if all goes well, then we can talk about things. And only what you want to do. And just so you know I would never turn down a surprise...lol." The two then spent the rest of the week devising a way to see each other.

Things culminated the following Saturday. Martin emailed "Jenna" asking what she was doing that day. "I can get away for a while if you can?" Martin offered. "Yea my mom is gonna b gone in like 30 mins," Hedden replied. Martin wrote back within three minutes, "Ok...tell me where I can mert u or pic u up..I will head towards jtown.." Hedden told Martin, "Text me" and supplied a phone number. The two then exchanged a series of text messages trying to determine what they might do. Hedden suggested they meet at a park in Louisville, Kentucky, and asked

Martin if he had gotten condoms. Martin said he hadn't, adding "Thought you wanted to take things slow...lol." Hedden replied, "U said u wanted to do other stuff tho LOL." "Well I do, but one thing at a time ok??" Martin responded. When Martin arrived, the police arrested him. In his truck, they found a bottle of a drug used to treat erectile dysfunction, empty packaging for another such drug, a box of a dietary supplement used to "enhance sexual function," and two devices which are used to "assist with erections."

B.

"A defendant claiming insufficiency of the evidence bears a very heavy burden" because we must consider "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Vincent*, 20 F.3d 229, 232–33 (6th Cir. 1994) (citations and quotation marks omitted). Again, there are two essential elements here: (1) government inducement of the crime, and (2) defendant's lack of predisposition to engage in the criminal conduct. *Mathews*, 485 U.S. at 62–63.

Martin trains his attention on predisposition. As he acknowledges, we have recognized five relevant factors for determining a defendant's predisposition:

[1] the character or reputation of the defendant, including any prior criminal record;

[2] whether the suggestion of the criminal activity was initially made by the Government;

[3] whether the defendant was engaged in the criminal activity for profit;

[4] whether the defendant evidenced reluctance to commit the offense, overcome only by repeated Government inducement or persuasion; and

[5] the nature of the inducement or persuasion supplied by the Government.

*United States v. Barger*, 931 F.2d 359, 366 (6th Cir. 1991) (quoting *United States v. Johnson*, 855 F.2d 299, 303 (6th Cir. 1988)). The district court expressly suggested to the jury that it

consider those factors. Nevertheless, Martin insists that given the evidence presented at trial, it was "patently clear" that he was not predisposed to commit his crimes and no reasonable juror could have found otherwise.

Martin's argument is twofold. First, he points to the clean record he had prior to his arrest. He was a "retired CPA, married for thirty-plus years, with adult children, who had never before been arrested for a misdemeanor or felony offense." When questioned by the police, he denied ever having "any kind of relations with an underage kid[.]" And at trial, the government did not introduce any character evidence. Second, Martin argues that it was the government that made the initial contact, suggested the "criminal activity," drove the conversation, and proposed the meeting place.

The evidence permitted a jury to see things differently than Martin's characterization. To begin, a first-time offender can be predisposed to commit a crime just as surely as a repeat offender can. *See United States v. Gordon*, 844 F.2d 1397, 1406 (9th Cir. 1988) ("[O]ne may be predisposed to commit his first crime as much, if not more than, a chronic offender."). And in the flurry of short emails between Martin and Hedden, one could conclude that it was Martin who first suggested that the two engage in sexual conduct and it was Martin who suggested they meet up in person. Even so, the government does not entrap a defendant by simply giving him the opportunity to commit a crime or initially suggesting it. *See United States v. Kussmaul*, 987 F.2d 345, 349 (6th Cir. 1993). Rather, we look to whether the government overcame the will of a reluctant, otherwise law-abiding person. *See Jacobson*, 503 U.S. at 553–54; *Barger*, 931 F.2d at 367. Reasonable jurors could have looked at the classified ad, the emails, and the other evidence and concluded that Martin did not require heavy persuasion by the government to do what he did.

II.

The question of predisposition also undergirds Martin's argument about the jury's question. About four hours after the jury began to deliberate, it sent the following note to the judge:

> Judge Hale, Number 1, Instruction Number 16 for entrapment, the Government must prove, beyond a reasonable doubt, that the defendant was already willing to commit the crime prior to first being approached (by a government agent)
>
> Are we to use the evidence presented in court to determine whether or not Mr. Martin was already willing to commit the crime before first being approached by "Jenna" (government agent)
>
> Since the evidence was gathered after the contact by a government agent, does (already willing) or the proof of willingness to commit the crime have to exist prior to "Jenna"?

The judge confessed that it was "not entirely clear" to him what the jury was asking and the attorneys for both sides agreed. After hearing from both sides, the court spent an hour researching how to best respond to the jury.

When proceedings resumed, the court proposed a response and then spent another 30 minutes discussing it with the parties, again going back and forth with counsel to hew phrasing acceptable to both sides. Eventually, the court proposed the exact language it intended to use, leading Martin's attorney to respond, "Judge, I will not object to what you've written here. And if you will answer in the affirmative to the first part and answer this to the second part, the defendant will agree to that and the Government and the defense is in accord." Martin's attorney confirmed that beyond the court's proposal, "nothing more [was] needed," and agreed that the instruction was "fair to the interests of both sides." The court then delivered the following instruction to the jury, and in precisely the manner Martin's attorney requested:

> As I instructed you earlier, yes, your decision must be based only on the evidence that you saw and heard here in court. You should consider all the evidence, both direct and circumstantial, and give it whatever weight you believe it deserves. Based on all of the evidence, decide if the Government has proved that the defendant was already willing to commit the crime as described in Instruction Number 16. The government may prove the defendant's state of mind based solely on evidence obtained after the defendant's contact with the government agent posing as Jenna. Remember that all the instructions are important and you should consider them together as a whole.

The jury then resumed deliberations and 20 minutes later returned with a verdict of guilty on both counts.

Martin now takes the position that the court's response to the jury's question was reversible error. If he had actually objected to the instruction, he would face a demanding standard to show that the court abused its discretion in giving the instruction—a standard he likely could not meet. *See United States v. Fisher*, 648 F.3d 442, 446–47 (6th Cir. 2011). But Martin did not object. Rather, he fully acquiesced to the instruction—indeed, played an integral part in crafting it—and thus waived his right to object to the instruction. *See* Fed R. Civ. P. 51(c); *United States v. Olano*, 507 U.S. 725, 733 (1993). Given this waiver, we decline to review Martin's claim that the district court erred in giving the instruction. *Cf. United States v. Aparco-Centeno*, 280 F.3d 1084, 1088 (6th Cir. 2002).

III.

Finally, Martin argues that he was not brought to trial speedily enough. He frames his claim both in terms of his constitutional right under the Sixth Amendment of the U.S. Constitution as well as his statutory rights under the Speedy Trial Act. But his arguments focus only on the Speedy Trial Act, so we constrain our review to those arguments.

Broadly speaking, the Speedy Trial Act sets a 70-day time limit for bringing a defendant to trial. 18 U.S.C. § 3161(c)(1). But the Act is flexible and allows a trial court to find certain periods "excludable," thus extending the deadline for commencing trial. *See id.* § 3161(h). When,

as here, the government moves for a continuance that would take the trial date beyond the initial 70 days, the court may exclude some of the days if it finds "that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial." *Id.* § 3161(h)(7)(A). The court must "set[] forth, in the record of the case, either orally or in writing, its reasons" for the finding. *Id.* We review such a decision for abuse of discretion. *United States v. Williams*, 753 F.3d 626, 635 (6th Cir. 2014).

Here, 20 days before trial, the government moved for a continuance of "at least six weeks or for whatever time the Court views as reasonable." The proffered reason was that the original prosecutor on the case would be "out of the office for the next month recovering from surgery" and the new prosecutor would require time to review the evidence. To boot, Martin had recently moved for the government to turn over certain evidence it intended to introduce at trial. Martin objected to the continuance. In his view, the case was not so complex that the new prosecutor would be unable to prepare in time while his own request for the evidence would not require a hearing or a special order. The court addressed Martin's objections, granted the government's motion, extended the trial date by 27 days and deemed those days excluded.

Martin contends that the district court failed to make the findings necessary to exclude the days. We disagree. The Speedy Trial Act provides a non-exhaustive list of factors a court should consider before granting a continuance. *See* 18 U.S.C. § 3161(h)(7)(B). The district court recognized these factors in its order. After doing so, it found that the need for the continuance did not stem from "a lack of diligent preparation on the part of the United States" and further found "that failure to grant the continuance would either deny the government continuity of counsel or deprive the government of the reasonable time necessary for effective preparation." Given these

findings and the short period of delay, we cannot say that the district court abused its discretion in granting the motion and excluding the 27 days.

IV.

We AFFIRM the judgment of the district court.