66 F.3d 327
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Richard A. WARREN, Defendant-Appellant.
 No. 94-5240.
 United States Court of Appeals, Sixth Circuit.
 Sept. 14, 1995.
 
 Before: KENNEDY and NORRIS, Circuit Judges; TAYLOR, District Judge.*
 OPINION
 ALAN E. NORRIS, Circuit Judge.
 
 
 1
 A jury convicted defendant Richard A. Warren on nine counts of fraud stemming from the destruction by fire of a house he owned. Defendant raises various challenges to his convictions. For the reasons that follow, we reverse one of his convictions, affirm the remainder, and remand for resentencing.
 
 I.
 
 2
 In July 1986, defendant purchased a house on Musket Drive in Florence, Kentucky. A fire destroyed the house in March 1987. Arson investigators for defendant's insurer, State Farm Insurance Company (State Farm), determined the fire to have been accidental. Pursuant to the insurance policy, State Farm paid off defendant's mortgages, which totaled about $326,000. Defendant sued State Farm for additional money to which he claimed to be entitled under the policy. In settlement of his claim, State Farm allowed defendant to purchase a replacement house for a cost not to exceed $578,665.
 
 
 3
 The settlement required defendant to live in the replacement house and maintain it as a single-family home. The settlement also stipulated that State Farm would pay defendant the difference between the value of the replacement house and the amount that State Farm paid to the Musket Drive mortgagees. The potential payout to defendant was $243,000. The settlement required defendant to purchase a replacement house before State Farm would pay him.
 
 
 4
 In June 1989, defendant became interested in purchasing a house on Squire Hill Drive that belonged to Abraham and Pauline Sutton who were bankrupt. In July 1989, defendant met with Nick Benson, the Suttons' attorney, to discuss the possibility of buying the house. According to Benson's testimony at defendant's trial, defendant offered to buy the house. Defendant told Benson, however, that to succeed in his effort to pocket the proceeds from State Farm's payout to him, the Squire Hill house, which was listed for $424,000, would have to be appraised at a minimum of $579,000. Pauline Sutton testified that defendant, for the same reason, insisted that the Suttons raise the asking price to $675,000. The Suttons testified that defendant persuaded them to agree to a deal in which he would make a $251,000 down payment to the Suttons and would then obtain a $424,000 mortgage for the balance of the purchase price. In spite of this written agreement, the Suttons were then to secretly return the $251,000 to defendant at closing. Defendant presented the written agreement to State Farm, which then appraised the house at $556,000. Because the appraisal value was lower than he had hoped, defendant convinced the Suttons to agree to reduce the total price to $661,000 and the down payment to $237,000. State Farm, based upon this second written contract, approved the final payout to defendant.
 
 
 5
 Defendant applied to Citibank Mortgage, Incorporated (CMI), for a mortgage in the amount of $424,000. In applying, he misrepresented the terms of the purchase agreement, his income, and his planned use of the house. After receiving via facsimile a copy of State Farm's check to defendant, CMI, in late August 1989, approved defendant's application and made the loan. Thomas Hufford, a CMI division credit manager and loan administrator, testified that CMI would not have made the loan had it not been misled by defendant's representations. The loan funds disbursed to defendant were insured by the Federal Deposit Insurance Company (FDIC).
 
 
 6
 According to trial testimony, in October 1989, defendant and the Suttons entered a secret contract that gave the Suttons the option to buy back the Squire Hill house. The Suttons paid defendant $237,000 for the option. The agreement entitled defendant to keep the $237,000 regardless of whether the Suttons exercised the option. The Suttons and defendant also entered a secret lease permitting the Suttons to reside in the home for six months for $1.00. State Farm officials testified that, had they known about the option contract and the $237,000 transfer from the Suttons to defendant, State Farm would not have approved the payout to defendant.
 
 
 7
 After closing on the Squire Hill house in late October 1989, defendant, through an insurance agent, applied to Chubb Insurance Company (Chubb) for homeowner's insurance for it. The application misrepresented defendant's intended use of the house and the magnitude of the Musket Drive fire. A Chubb property inspector concluded that defendant had lied in his application and recommended the cancellation of the conditional policy that Chubb had issued. In response to Chubb's invitation to supplement the application, defendant made misrepresentations that persuaded Chubb to allow the policy to remain in force.
 
 
 8
 On April 30, 1990, a fire that was determined to have been intentionally set damaged the Squire Hill house. In late May 1990, police arrested Ted Huddleston, a tenant in one of the apartment buildings owned by defendant, for torching the house. He admitted setting the fire and said that defendant had hired him to do so in exchange for $3,000. He helped police monitor his subsequent conversations with defendant. During those conversations, defendant and Huddleston discussed Huddleston's compensation and planned a strategy.
 
 
 9
 During this same period, defendant filed a claim form with Chubb and submitted a sworn proof of loss form in which he denied being involved in burning the house. Because he refused to comply with Chubb's request that he be interviewed under oath, Chubb made no payments to defendant.
 
 
 10
 A federal grand jury indicted defendant on eleven counts relating to the Musket Drive and Squire Hill fires; the charges included, among others, arson, bank fraud, wire fraud, and mail fraud. A jury trial ensued. The prosecution's case against defendant hinged, to a large extent, on the testimony of Huddleston. According to his testimony, at around the time Chubb agreed to insure the Squire Hill house, defendant approached him about burning the home. He stated that he and defendant together planned the arson in great detail and that, on the day of the Squire Hill fire, pursuant to their plan, he delayed going to the house until defendant called him from his place of work in Ohio. Huddleston also testified in detail about how he burned the house and his conferences with defendant after the fire. Defendant tried to undermine the prosecution's case by suggesting that Huddleston set the fire on his own initiative because of animosity toward defendant.
 
 
 11
 During the trial, the district court dismissed Counts I and II of the indictment, the counts relating to the Musket Drive fire, for lack of evidence. The jury found defendant guilty of the remaining nine counts, and the district court sentenced defendant to thirteen years' imprisonment. Defendant now seeks our review.
 
 II.
 
 12
 Count XI of the indictment alleged that defendant violated 18 U.S.C. Sec. 844(i), which makes it criminal to "damage[ ] or destroy[ ], ... by means of fire or an explosive, any building." Count X alleged that defendant violated 18 U.S.C. Sec. 844(h)(1), which provides for an enhanced penalty for a person who "use[s] fire or an explosive to commit any felony ... including a felony which provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device." As the predicate felony for the application of 18 U.S.C. Sec. 844(h)(1), Count X identified the attempted fire destruction of the Squire Hill house. Defendant contends that it violated the Fifth Amendment's Double Jeopardy Clause to try him for violating Sec. 844(h)(1), a provision that enhances one's sentence for using fire to commit a crime, when the predicate offense was destroying a building by means of fire, a violation of Sec. 844(i). We review such a legal argument de novo. United States v. Cameron, 953 F.2d 240, 243 (6th Cir.1992).
 
 
 13
 The Double Jeopardy Clause prohibits, inter alia, multiple punishments for the same offense. Ohio v. Johnson, 467 U.S. 493, 498 (1984). Cumulative punishment for the same offense does not, however, constitute double jeopardy when the "legislature specifically authorizes cumulative punishment under two statutes." Missouri v. Hunter, 459 U.S. 359, 368-69 (1983). While conceding that Counts X and XI alleged the same conduct, the government argues that Congress has authorized cumulative punishment in this context and that defendant was thus not subjected to double jeopardy.
 
 
 14
 We approach this question with the presumption that Congress would not ordinarily enact two statutes proscribing the same conduct. Our search is thus for a clear indication of congressional intent to cumulatively punish the same offense. Whalen v. United States, 445 U.S. 684, 691-92 (1980). We find no clear indication that Congress has authorized cumulative punishment under Secs. 844(h)(1) and 844(i). In fact, the two sections cannot be sensibly read to do so. Section 844(h)(1) enhances a defendant's penalty because he used a particularly dangerous instrumentality, fire or an explosive, to facilitate the commission of a felony. The only way to commit arson in violation of Sec. 844(i), however, is to use one of those dangerous instrumentalities. The purpose of Sec. 844(h)(1) would thus not be served by applying it when the predicate offense is a violation of Sec. 844(i). We are therefore unable to conclude that Congress specifically authorized the application of Sec. 844(h)(1) when the predicate offense is a violation of Sec. 844(i).
 
 
 15
 The government argues that Congress' 1988 amendment of Sec. 844(h)(1) to make it applicable to "felon[ies] which provide[ ] for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device" compels the opposite conclusion. We disagree. That provision would apply to a defendant who uses fire to commit a felony for which another statute provides an enhanced penalty for the use of a dangerous weapon or device. The provision allows an extra penalty for the commission of an offense in a manner that poses a serious threat to a large number of people. In other words, the 1988 amendment creates an extra level of deterrence to discourage people who choose to commit a felony with a dangerous weapon from making fire their weapon of choice. Since arson by definition requires the use of fire, this rationale does not apply in a situation in which arson is the predicate felony. Thus, the 1988 amendment does not signal a congressional desire to cumulatively punish arson and the use of fire in the commission of arson.
 
 
 16
 Since Congress did not intend to cumulatively punish violations of Secs. 844(h)(1) and 844(i), it would constitute double jeopardy to punish defendant under both of those provisions. As relief, defendant asks us to vacate both the Count X and Count XI convictions. In the multiple punishments context, however, the interest protected by the Due Process Clause is that of "ensuring that the total punishment did not exceed that authorized by the legislature." United States v. Halper, 490 U.S. 435, 450 (1989). Vacating one of those convictions will vindicate this interest, and we therefore vacate defendant's Count X conviction for violating Sec. 844(h)(1) but affirm defendant's Count XI conviction for violating Sec. 844(i).
 
 III.
 
 17
 The jury, by a general verdict, convicted defendant of Count IV of the indictment, which alleged that defendant conspired with others, in violation of 18 U.S.C. Sec. 371, to commit seven related object offenses, including burning the Squire Hill house and employing fire to commit a felony. Defendant argues that, because his conviction under Sec. 844(h)(1) must be vacated and, since the jury might have based its general conspiracy verdict on that object offense, we should reverse the conspiracy conviction. His argument relies upon Yates v. United States, 354 U.S. 298, 311-12 (1957). There, the Supreme Court vacated a conspiracy conviction upon concluding that a statute of limitations barred one of the two alleged object offenses. The Court held that the conspiracy conviction must fall because the jury, since it returned only a general verdict, must be presumed to have relied upon the legally deficient object. Id. at 312.
 
 
 18
 The present case is distinguishable from the situation addressed in Yates. There, the conspiracy conviction was presumed to have been based upon an object offense that "was insufficient in law," Griffin v. United States, 502 U.S. 46, 52 (1991), in the sense that it could not have been the basis of a valid independent prosecution. No such legal insufficiency exists with respect to the Sec. 844(h)(1) charge against defendant. That is, defendant could have been validly convicted under either Sec. 844(h)(1) or Sec. 844(i). Because there is no chance that the jury based its conspiracy verdict upon an object offense that was, as contemplated by Yates, legally insufficient, Yates does not compel us to vacate defendant's conspiracy conviction.
 
 
 19
 As an alternative challenge to his conspiracy conviction, defendant argues that a statement by the prosecution in a post-trial pleading constitutes an admission that several of the overt acts alleged in the indictment are invalid because they occurred prior to any conspiratorial agreement. Because the prosecution's statement, directed to defendant's contention that he had been selectively prosecuted, cannot be construed as an admission of the invalidity of any of the alleged overt acts, we also reject this argument.
 
 
 20
 Our rejection of these arguments relating to the validity of his conspiracy conviction compels us to reject another of defendant's challenges to his arson conviction. Defendant's Count XI arson conviction was obtained under the rule of Pinkerton v. United States, 328 U.S. 640, 646-47 (1946), that renders each member of a conspiracy criminally liable for acts committed by his coconspirators in furtherance of the conspiracy. The Pinkerton rule allowed the prosecution to convict defendant of arson upon proof that Huddleston, a coconspirator, torched the Squire Hill house in furtherance of the conspiracy. In light of our affirmance of his conspiracy conviction, we reject defendant's contention that Pinkerton liability cannot attach because the conspiracy conviction is infirm.
 
 IV.
 
 21
 Defendant next contends that the prosecution did not present evidence sufficient to support his convictions. In reviewing such a contention, we ask whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found all of the elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). We do not weigh the evidence or determine the credibility of witnesses. United States v. Gallo, 763 F.2d 1504, 1518 (6th Cir.1985), cert. denied, 475 U.S. 1017 (1986).
 
 A.
 
 22
 The jury, pursuant to Count V of the indictment, convicted defendant of defrauding a federally insured bank, CMI, in violation of 18 U.S.C. Sec. 1014.[1] Defendant challenges the sufficiency of the evidence that CMI is an institution whose accounts are insured by the FDIC. The only evidence of CMI's status as a federally insured institution was the testimony of Hufford, a CMI loan administrator. He testified as follows:
 
 
 23
 Q. Are you familiar with where the money came from to pay out on this loan as far as in the Citibank and Citicorp structure?
 
 
 24
 A. Yes.
 
 
 25
 Q. Where does the money that Citicorp used to pay out on this loan--where is it kept?
 
 
 26
 A. It comes from Citibank, NA.
 
 
 27
 Q. And is Citibank, NA insured by the Federal Deposit Insurance Corporation?
 
 
 28
 A. Yes, we are.
 
 
 29
 Q. And were the deposits that were used to pay off on the loan insured by FDIC?
 
 
 30
 A. Yes.
 
 
 31
 We reject defendant's argument that because Hufford was not an employee of Citibank, N.A., his testimony is inadequate to prove that Citibank, N.A. was federally insured. The weight to be given to Hufford's testimony was an issue for the jury, United States v. Hamilton, 684 F.2d 380, 383 (6th Cir.), cert. denied, 459 U.S. 976 (1982), and we will not substitute our judgment.
 
 
 32
 Defendant also argues that, even assuming that Citibank, N.A. was federally insured, the prosecution at most proved that some relationship exists between CMI and a federally insured institution (Citibank, N.A.), proof that the Fifth Circuit has found to be insufficient. United States v. Schultz, 17 F.3d 723, 727 (5th Cir.1994) (holding that proof that the victim bank was loosely related to a federally insured bank was not sufficient to establish that the victim bank was federally insured). This case is distinguishable. Hufford's testimony, unlike the evidence in Schultz, permits the reasonable inference that an intimate relationship exists between CMI and Citibank, N.A. in which CMI administers loans that are funded by Citibank, N.A. The evidence suggests that, for purposes of the loans that CMI administers, CMI and Citibank, N.A. are but one entity. The evidence is therefore sufficient to establish that defendant defrauded an institution whose accounts are insured by the FDIC.
 
 
 33
 Defendant next argues that the prosecution failed to prove--as it must to establish a violation of 18 U.S.C. Sec. 1014--that defendant knowingly made a false statement or report to CMI. The prosecution's only evidence on this element was a loan application that was completed by an employee of N.V. Homes while in the company of defendant. The application bears defendant's signature and that of Barbara Biehl, a loan officer for N.V. Homes. Biehl testified that the signature is not hers but that, at the time the application was completed, her subordinates were authorized to sign her name on documents. Defendant argues that the district court erred by admitting the document into evidence and that, without the document, there is no evidence that he made a false statement to CMI.
 
 
 34
 Our review of this issue is limited because defendant failed to lodge a contemporaneous objection to the admission of the loan application. When the prosecution moved "for admission of" the document, defendant's lawyer responded, "[n]o objection." Only later, after Biehl testified that neither the handwriting nor the signature on the application were hers, did defendant unsuccessfully move to strike the application from the record. When, as here, a party on appeal challenges the admission of evidence to which he failed to contemporaneously object, we review for plain error only. United States v. Samour, 9 F.3d 531, 537 (6th Cir.1993).
 
 
 35
 Defendant argues that the district court should have excluded the application on either of two grounds. First, he argues that the document is hearsay that does not come within an exception to the rule excluding hearsay. Second, he argues that the admission of the document violated the Sixth Amendment's Confrontation Clause, which normally requires the prosecution to prove the unavailability of a hearsay declarant who is not present for cross-examination. Ohio v. Roberts, 448 U.S. 56, 66 (1980).
 
 
 36
 These arguments lack merit. It is essentially undisputed that defendant signed the loan application. Thus, although he did not write the statements on the application, he adopted them as his own when he signed the form. The application is, then, most accurately viewed as a series of statements by him rather than as an assertion by the bank employee. See, e.g., Pillsbury Co. v. Cleaver-Brooks, 646 F.2d 1216, 1218 (8th Cir.1981); United States v. Smith, 609 F.2d 1294, 1301 n. 7 (9th Cir.1979). We treat such adoptive admissions as non-hearsay that is admissible against a party opponent. Fed.R.Evid. 801(d)(2)(B). Moreover, when one views the statements on the application as those of defendant, the application does not fit within the definition of hearsay in Federal Rule of Evidence 801(c), since the prosecution offered it not to establish the truth of those assertions but instead to establish the fact that defendant made the (untrue) statements. E.g., United States v. Hathaway, 798 F.2d 902, 904-05 (6th Cir.1986). Since the application is not hearsay, defendant's Confrontation Clause contention must fail.
 
 
 37
 In conjunction with his challenge to the sufficiency of the evidence supporting his bank fraud conviction, defendant argues that the jury instructions impermissibly constructively amended the indictment. Because defendant did not lodge a contemporaneous objection at trial, we review for plain error only. United States v. Combs, 33 F.3d 667, 669 (6th Cir.1994).
 
 
 38
 A rich jurisprudence has developed regarding the nature and consequences of deviations between the indictment, the proof actually adduced, and the trial court's instructions to the jury.
 
 
 39
 A constructive amendment occurs when the terms of an indictment are in effect altered by the presentation of evidence and jury instructions which so modify the essential elements of the offense charged that there is a substantial likelihood that the defendant may have been convicted of an offense other than that charged in the indictment.
 
 
 40
 Hathaway, 798 F.2d at 910. A variance, on the other hand, occurs "when the charging terms are unchanged, but the evidence at trial proves facts materially different from those alleged in the indictment." Id. Whereas an amendment is prejudicial per se, we will reverse due to a variance only if it affected the defendant's substantial rights. Id. at 910-11.
 
 
 41
 Here, the indictment charged defendant with making a false statement on a loan application "for the purpose of influencing Citicorp Mortgage, Inc., an institution the accounts of which are insured by the [FDIC]." The jury instructions--which tracked the prosecution's closing argument--required the jury to find "[t]hat Citicorp Mortgage, Inc. is a wholly owned subsidiary of Citicorp Banking Corporation, which is a wholly owned subsidiary of Citicorp, whose funds were federally insured." Defendant argues that, by removing the requirement that the accounts of CMI--as opposed to those of Citicorp--be federally insured, the instructions constructively amended the indictment.
 
 
 42
 The evidence regarding the federally insured status of the entity defrauded by defendant differed slightly from the allegations of the indictment. The jury instruction reflected that difference. The difference, however, did not create a risk that defendant might be convicted of an offense other than the bank fraud charged by the grand jury. The deviation here is thus to be treated as a variance. We further conclude that the variance did not in any way prejudice defendant's substantial rights. The indictment charged him with defrauding a federally insured bank. Although the evidence did not show that CMI is itself federally insured, it did show that the funds used to pay the loan were federally insured. The bank fraud jury instruction thus flowed from the indictment and tracked the evidence showing that the loan funds were federally insured. The district court's bank fraud instruction therefore did not impair defendant's substantial rights and certainly did not rise to the level of plain error.
 
 B.
 
 43
 Pursuant to Count III of the indictment, the jury convicted defendant of wire fraud, a violation of 18 U.S.C. Sec. 1343. The indictment alleged that defendant caused the interstate telefax transmission of a $243,000 check from State Farm Insurance in Murfreesboro, Tennessee to the trustee in the Suttons' bankruptcy in Kentucky. Defendant contends that the prosecution failed to present any legally sufficient evidence that this particular interstate wire transmission occurred.
 
 
 44
 The government concedes as much but argues that the prosecution introduced evidence that the $243,000 check was faxed from Kentucky to Missouri; this minor discrepancy, the government argues, is inconsequential. As we noted above, such a variance requires reversal only when it prejudiced the defendant's ability to mount a defense. Hathaway, 798 F.2d at 910. The prosecution did present evidence, in the form of the trial testimony of Hufford, that tended to prove that the $243,000 check was faxed from Kentucky to Missouri. The relevant testimony proceeded as follows:
 
 
 45
 Q. All right. Shortly before closing, did you receive a facsimile transmission regarding a check that was being made payable to the defendant as the down payment in this situation?
 
 
 46
 A. Yes, we did. One of the stipulations for the loan approval was for us to in fact see the disbursement of the down payment from State Farm Insurance.
 
 
 47
 Q. And did you receive it?
 
 
 48
 A. Yes, we did.
 
 
 49
 Although Hufford's testimony is unclear, a reasonable interpretation of it is that CMI did in fact receive the check--not just a fax regarding the check--in Missouri via telefax from Kentucky. While the indictment alleged the transmission of a check from Tennessee to Kentucky, this variance between the indictment and the proof was minimal and could not have affected defendant's ability to defend against the wire fraud charge. We therefore conclude that the variance does not warrant vacating his wire fraud conviction and that the prosecution presented evidence sufficient to sustain defendant's wire fraud conviction.
 
 C.
 
 50
 To convict defendant of mail and wire fraud, the prosecution had to prove that he participated in a fraudulent scheme and had the intent to defraud Chubb. 18 U.S.C. Secs. 1341 and 1343. Defendant argues that the intentional destruction of the Squire Hill house was at the heart of the fraudulent scheme alleged by the prosecution. Since the arson conviction is invalid in his view, he argues that the prosecution failed to establish the existence of a fraudulent scheme. He makes a similar argument regarding his conviction for violating 18 U.S.C. Sec. 1952(a)(3) by travelling in interstate commerce to promote the unlawful activity of arson.
 
 
 51
 Since we affirm the Count XI arson conviction, we reject these arguments. We would reject them even had we vacated the arson conviction because, regardless of the legal validity of the arson conviction, the prosecution presented overwhelming evidence--a sampling of which appears in our fact discussion above--that defendant arranged for the burning of the Squire Hill house as part of a scheme intended to defraud Chubb and, to that end, travelled in interstate commerce.
 
 D.
 
 52
 Pursuant to Count VIII of the indictment, the jury found defendant guilty of solicitation of arson. This charge required the prosecution to prove that defendant, with the intent that another person commit arson, solicited the crime "under circumstances strongly corroborative of that intent." 18 U.S.C. Sec. 373(a). Defendant argues that the prosecution failed to present sufficient evidence indicating that he actually intended for Huddleston to torch the Squire Hill house.
 
 
 53
 This contention is utterly meritless. Huddleston testified that defendant asked him to torch the Squire Hill house, gave him a floor plan of the house, gave him money to buy materials to set the fire, left doors and windows ajar to permit him to enter, told him when to burn the house, and promised him compensation for doing the job. This testimony alone was sufficient to establish that defendant's request to Huddleston was made under circumstances strongly corroborative of his intent that the request be carried out. Accordingly, we reject defendant's challenge to his solicitation conviction.
 
 
 54
 In sum, the prosecution presented legally sufficient evidence to support each of defendant's convictions.
 
 V.
 
 55
 Defendant finally argues that a variety of prosecutorial misconduct deprived him of a fair trial. He first contends that the prosecution pursued the Musket Drive fire despite knowing that that fire was accidental to introduce inadmissible evidence of prior bad acts and to improperly suggest to the jury that the two fires were no mere coincidence. As evidence that the prosecution's effort to prove that the Musket Drive fire resulted from arson was not bona fide, defendant notes that the prosecution's own expert witness testified that the Musket Drive fire was accidental.
 
 
 56
 The prosecutorial decision to pursue the Musket Drive fire does not constitute misconduct. While the prosecution's case on the Musket Drive fire was weak, the evidence was not so lacking as to necessarily lead to the conclusion that the prosecution used the Musket Drive charges as a pretext for making improper suggestions to the jury. In any event, any prejudice resulting from the ill-fated attempt to prosecute defendant for the Musket Drive fire was minimized by the district court's admonition, after the dismissal of the counts relating to it, to disregard the Musket Drive evidence. Moreover, in view of the overwhelming evidence regarding the Squire Hill fire, any "spillover" that might have occurred was not prejudicial.
 
 
 57
 Second, defendant argues that he was prejudiced by the three-year delay between the Squire Hill fire and his indictment for causing that fire. In the absence of any suggestion or showing by defendant that the prosecution intentionally created the delay to gain a tactical advantage, we reject this argument. See United States v. Brown, 959 F.2d 63, 66 (6th Cir.1992).
 
 
 58
 Third, defendant argues that the prosecution acted improperly by playing for the jury a portion of a recorded conversation in which an agent of the Bureau of Alcohol, Tobacco, and Firearms said to him, "[l]ast time I talked to you, you had some conversation with [your lawyer] about a polygraph, and you said he advised against that." Defendant argues, and we agree, that this reference amounts to an assertion that defendant had refused to submit to a polygraph examination. The government argues that the polygraph reference was played inadvertently and did not prejudice defendant because it did not directly attack his credibility.
 
 
 59
 In United States v. Walton, 908 F.2d 1289, 1293 (6th Cir.), cert. denied, 498 U.S. 990 (1990), we held that a passing reference to a polygraph test does not compel a mistrial when the reference is not intentional and relates to a witness's rather than to a defendant's refusal to take a polygraph test. We distinguished United States v. Murray, 784 F.2d 188 (6th Cir.1986), in which we vacated a conviction because a prosecution witness, a seasoned F.B.I. agent, testified that he had asked the defendant to take a polygraph test.
 
 
 60
 The facts in the present case more closely resemble Murray than Walton. Here, the polygraph reference related to defendant--rather than a witness--and thus tended to cast doubt on his credibility. Moreover, the prosecution should have prevented the inadvertent polygraph reference. Modern audio technology makes available a plethora of preventive measures that could have been employed to keep the jury from hearing the improper remark.
 
 
 61
 Murray weighs in favor of vacating defendant's convictions. In particular, because the jury necessarily discredited his denial of guilt, defendant can make a plausible argument that the polygraph reference prejudiced him. However, the unintentional introduction of the polygraph reference was harmless in light of the mountain of evidence that contradicted defendant's version of events. The jury's rejection of defendant's denial of guilt almost surely resulted from the overwhelming evidence of his guilt rather than the isolated and comparatively innocuous polygraph reference. Our decision in this regard is buttressed by the fact that the district court strongly admonished the jury to disregard the polygraph reference. Accordingly, the polygraph reference, although improper, was harmless and therefore not a reason to reverse defendant's convictions.
 
 
 62
 Defendant also contends that his ability to defend against the charges was prejudiced by the prosecution's decision to bring diverse charges--arson and several varieties of commercial fraud--against him in a single indictment. Because the various charges arose from one scheme and were inextricably linked, we conclude that they were properly charged and tried together and accordingly reject this argument.
 
 
 63
 Next, defendant argues that the government lied when it told him, prior to trial, that it had not granted prosecutorial immunity to any of its witnesses. It is not disputed that the prosecution apprised defendant of its grants of immunity early enough that he could use that information to impeach the prosecution's witnesses. That being the case, even assuming arguendo that the prosecution did lie to defendant, we conclude that defendant was not prejudiced as a result.
 
 
 64
 Next, defendant contends that the government, during its opening statement, made two references that were not supported by evidence presented during the trial and, during its closing argument, misstated the evidence. The opening statement assertions of which defendant complains were arguably substantiated by evidence presented during the trial. In closing, the prosecution did nothing more than present its theory of the significance of the evidence that had been presented. We therefore discern no misconduct. Any arguable misconduct was not prejudicial in view of the district court's jury instruction that opening statements and closing arguments do not constitute evidence.
 
 
 65
 Defendant also contends that he was prejudiced by the presentation of perjured testimony. On direct examination by the prosecution, Huddleston testified that he was a military veteran who had been wounded in Vietnam. In fact, Huddleston was never in Vietnam. Since defendant does not even allege that the prosecution knew that Huddleston was lying, we cannot say that the presentation of the testimony constituted prosecutorial misconduct. Moreover, far from prejudicing him, Huddleston's perjury actually benefitted defendant. The district court permitted him to present a witness who dramatically revealed Huddleston's prevarication, a turn of events that greatly undercut the credibility of the prosecution's "star" witness. Even if defendant could show that the prosecution intentionally presented Huddleston's perjured testimony, he would be unable to show that the testimony resulted in prejudice to him.
 
 
 66
 Finally, defendant argues that he was prosecuted because of his status as a lawyer and a TV weatherman. He bases this argument upon a statement by an Assistant United States Attorney to the grand jury that "there is another fun thing you'll have a good time with. He [defendant] is a lawyer, so you guys get to take down a lawyer. So that will be fun." We agree with defendant that this comment was inappropriate, unprofessional, and inane. Since the comment was made to the grand jury, however, it did not prejudice defendant's right to a fair trial. Furthermore, because the grand jury undoubtedly would have indicted defendant even had the comment not been made, the comment does not create a basis for dismissing the indictment.
 
 
 67
 In sum, any prosecutorial misconduct that occurred, even when viewed in combination, did not deprive defendant of a fair trial. We therefore reject his argument that his convictions offend due process.
 
 VI.
 
 68
 We reverse defendant's conviction under Count X of the indictment, affirm in all other respects, and remand this cause in order that the district court may resentence defendant accordingly.
 
 
 
 *
 The Honorable Anna Diggs Taylor, United States District Judge for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 18 U.S.C. Sec. 1014 prohibits "knoiwngly mak[ing] any false statement or report ... for the purpose of influencing in any way the action of ... any institution the accounts of which are insured by the Federal Deposit Insurance Corporation."